The ASOCIACION COLOMBIANA de EXPORTADORES de FLORES, et al., Plaintiffs,

v.

The UNITED STATES, Defendant,

and

Floral Trade Council of Davis, California, Defendant–Intervenor.

FLORAL TRADE COUNCIL OF DAVIS, CALIFORNIA, Plaintiffs,

v.

The UNITED STATES, Defendant,

and

the Asociacion Colombiana de Exportadores de Flores, et al., and American Flower Corp., and the Government of Israel and Agrexco, Agricultural Export Co., and Bedrijfschap Voor de Groothandel, etc. and Vereniging Van Bloemenveiling, etc., Defendant–Intervenors.

FLORAL TRADE COUNCIL OF DAVIS, CALIFORNIA, Plaintiffs,

v.

The UNITED STATES, Defendant,

and

Flores Esmeralda S.R.L., and the Government of Kenya, Defendant–Intervenor.

Court Nos. 87–04–00623, 87–04–00634 and 87–04–00689.

United States Court of International Trade.

July 14, 1988.

Heron, Burchette, Ruckert & Rothwell (Thomas A. Rothwell, Jr., James M. Lyons and William E. Donnelly), Washington, D.C., for Asociacion Colombiana de Exportadores and American Flower Corp.

Joseph A. Vicario, Jr. and Alfred G. Scholle, Washington, D.C., for Asociacion Colombiana de Exportadores.

Stewart & Stewart (Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr. and Jimmie V. Reyna), Washington, D.C., for The Floral Trade Council of Davis, California.

Lyn M. Schlitt, Gen. Counsel, James A. Toupin, Asst. Gen. Counsel and (Judith M. Czako), U.S. Intern. Trade Com'n, Washington, D.C., for defendant.

Kaplan, Russin & Vecchi (Kathleen F. Patterson and Dennis James, Jr.), Washington, D.C., for The Government of Israel and Agrexco Agricultural Export Co.

Gustav Springer, New York City, for Bedrijfschap Voor de Groothandel, etc. and Vereniging Van Bloemenveiling, etc.

Prather, Seeger, Doolittle & Farmer (Edwin H. Seeger), Washington, D.C., for Flores Esmeralda, S.R.L.

Duncan, Allen and Mitchell (John P. Williams and Leslie A. Glick), Washington, D.C., for The Government of Kenya.

## OPINION AND ORDER

RESTANI, Judge:

This matter involves consolidated actions challenging International Trade Commission (ITC) determinations as to injury from less than fair value (LTFV) and subsidized imports of cut flowers from Canada, Chile, Columbia, Costa Rica, Ecuador, Israel, the Netherlands, Mexico, Kenya and Peru.[1] *Certain Fresh Cut Flowers from Canada, Chile, Colombia, Costa Rica, Ecuador, Israel, and the Netherlands,* USITC Pub. 1956, Inv. Nos. 701–TA–275 through 278 and 731–TA–327 through 331 (Mar. 1987); *Certain Fresh Cut Flowers from Peru, Kenya and Mexico,* USITC Pub. 1968, Inv. Nos. 303–TA–18 and 731–TA–332, 333 (Apr. 1987).[2] The following seven cut flowers were involved: standard carnations, miniature carnations, standard chrysanthemums, pompon chrysanthemums, alstromeria, gerberas, and gypsophila. ITC's final investigation covered the period 1983 through the first nine months of 1986.

---

1. Imports from Canada, Chile, Peru, Israel and the Netherlands were found by the Department of Commerce, International Trade Administration (ITA) to have been subsidized. Imports from Canada, Chile, Colombia, Costa Rica, Ecuador, Kenya and Mexico were found by ITA to have been sold at LTFV.

2. Throughout this opinion, the court discusses these two determinations without differentiation because the issues discussed in this opinion were treated by the commissioners in the same manner in both determinations.

Three ITC commissioners, constituting a majority as to the affirmative determinations noted below, found seven different domestic industries produced the "like" products involved, that is, each type of flower was found to be produced by a different domestic industry. USITC Pub. 1956. This majority found material injury by reason of subsidized imports of standard carnations from Canada and Chile, as well as by subsidized imports of standard chrysanthemums from the Netherlands. It found material injury by reason of LTFV imports of standard carnations from Canada, Chile, Columbia, Costa Rica, and Ecuador, of standard chrysanthemums from Colombia and Ecuador, and of pompon chrysanthemums from Colombia, Costa Rica and Ecuador. It found further that LTFV imports of miniature carnations from Colombia threatened injury, and that there was no threat of material injury by reason of imports of miniature carnations from Canada, the Netherlands and Kenya. This same majority also found material injury with respect to subsidized imports of pompon chrysanthemums from Peru, and LTFV imports of standard carnations from Kenya and Mexico and of standard and pompon chrysanthemums from Mexico. USITC Pub. 1968. A second majority, comprised of one of the commissioners in the first majority discussed above and the two remaining commissioners, rendered a negative decision with respect to threat of material injury by reason of imports of miniature carnations from Costa Rica, Ecuador, Israel and Peru.

In this action, Asociacion Colombiana de Exportadores de Flores (Asocolflores) and others with similar interests challenge the affirmative decision with regard to imports of standard and miniature carnations, and standard and pompon chrysanthemums from Colombia on the basis that the first ITC majority erred in finding seven domestic industries and that the domestic industry was not suffering or threatened with material injury. ITC and the Floral Trade Council oppose these views. Floral Trade Council, on the other hand, challenges the negative ITC threat determination with respect to imports of miniature carnations from Costa Rica, Ecuador, Israel, Peru, Kenya, the Netherlands, and Canada on the basis of failure to cumulate and, as to miniature carnations from the first four countries, lack of substantial evidence in view of likely price suppression or depression and likely product shifting. ITC, Asocolflores, and representatives of the cut flower industries and/or the governments of Costa Rica, Israel, Kenya, and Peru have filed briefs opposing these views.

## I. LIKE PRODUCT

The threshold question in this case is what is the domestically produced product which is "like" the products under investigation. Until that question is answered, it is impossible to determine which industry is to be examined for injury or threat of injury. Based on their finding that the entire cut flower industry in the United States was the relevant industry producing the product like those under investigation, two commissioners reached a negative determination as to all imports. No one has seriously challenged their conclusions that the cut flower industry as a whole is neither injured nor threatened with injury. Three commissioners found, however, injury or threat of injury to different domestic industries by reason of imports of certain flowers. Their determination was based on the underlying finding that each of the seven flowers under investigation, including each of the four flowers that are involved in this action, is like only that particular flower type. Thus, seven different domestic industries were found to exist. This finding necessarily means that ITC also found that each flower is unlike the six other flowers under investigation or any other domestically produced flower.

An understanding of the position of the ITC commissioners is of central importance in this case. As stated, the aspects of the determinations under review involve two majorities. One majority found material injury by reason of imports of standard carnations and standard and pompon chrysanthemums from Colombia, as well as threat of injury by reason of imports of miniature carnations from Colombia. This

majority (together with the two remaining commissioners) also found no threat of injury by reason of miniature carnations from Canada, the Netherlands and Kenya. The other majority, comprised of one commissioner in the first majority and the two commissioners who found one domestic cut flower industry, rendered a negative decision with respect to threat of injury by reason of imports of miniature carnations from Costa Rica, Ecuador, Israel and Peru. In order for this negative threat determination to stand, the opinions of the two commissioners who found one domestic cut flower industry must be sustained, as well as the determination that seven industries existed. Thus, ITC requests the court to find that two opposite conclusions as to what is the like product at issue are supported by substantial evidence. This is not impossible; substantial conflicting evidence upon which reasonable minds could reach differing results might exist. There is, however, very little evidence of record in this case to support a finding of one domestic cut flower industry.

■ First, very little evidence regarding the entire flower industry was obtained. It is difficult to fault the dissent for this, as it sought to obtain information on flowers other than the seven investigated, particularly information on one flower, roses, but it was outvoted on this point.[3] Nonetheless, the court can only review information that was obtained. The sole relevant evidence cited in the opinions finding one industry is the testimony of representatives of a retailing organization indicating that substitutability is high at the consumer stage. If one has to choose a single basis upon which to make a like product determination, consumer preference would seem to be a poor choice. For example, if apples are sold out, a shopper might buy oranges, but this does not make apples and oranges like products. On the other hand, someone who wears a size ten skirt is not going to accept a size six, but this does not make the two garments unlike for purposes of injury determinations. Even if consumer acceptance of a substitute is one of the factors to be considered in making the like product determination, the evidence cited here supporting that factor, by itself, is insufficient to support the one-industry determination.[4] It simply does not rise to the level of substantial evidence.

Second, one commissioner viewed the like product issue as essentially a legal one, a position to which Asocolflores subscribes. That is, Asocolflores would like the court to rule as a matter of law that differences in specific use may not lead to multiple like product determinations, citing various cases, e.g., *Top-of-the-Stove Stainless Steel Cooking Ware from Korea and Taiwan*, USITC Pub. 1936, Inv. Nos. 701–TA–267, 268 and 731–TA–304, 305 (Jan. 1987) (various cooking ware including sauce pans, skillets and stock pots found to be like products), *64K Dynamic Random Access Memory Components from Japan*, USITC Pub. 1862, Inv. No. 731–TA–270 (Jun. 1986) (chips of various densities found to be like products), and *Natural Bristle Paint Brushes from the People's Republic of China*, USITC Pub. 1805, Inv. No. 731–TA–244 (Jan. 1986) (natural and synthetic brushes found to be like products). Asocolflores argues that in these cases minor differences were found not to distinguish one product from another, and to be consistent here, ITC should not permit minor differences, i.e., differences in specific use, to cause a finding of several distinct like products.

---

**3.** It is unclear whether the type of information sought to be obtained would have shed any light on the like product issue, and adequacy of the investigation was not an issue raised directly by any of the parties.

**4.** One commissioner claims that the one-like product, one-industry determination is "bolstered" by ITA's failure to distinguish between flower types in its determinations. As the evidence underlying ITA's class determinations is not included in the record in this case, ITA's findings are not supportive. For administrative ease and to avoid complications it would be helpful if the decisions of ITC and ITA were coterminous, but they are separate decisions that ultimately are made on separate bases. This does not prevent ITC, however, from requesting whatever information ITA has on characteristics and uses.

■ The reference to minor differences seems to stem from the legislative history of the Trade Agreements Act of 1979:

> The requirement that a product be "like" the imported article should not be interpreted in such a narrow fashion as to permit minor differences in physical characteristics or uses to lead to the conclusion that the product and article are not "like" each other, nor should be the definition of "like product" be interpreted in such a fashion as to prevent consideration of an industry adversely affected by the imports under investigation.

S.Rep. No. 249, 96th Cong., 1st Sess. 90–91 (1979) *reprinted in* 1979 U.S.Code Cong. & Admin.News 381, 476–77. The import of this passage is that a like product determination should not be fashioned to achieve a particular result. It is up to ITC to determine objectively what is a minor difference. Given the factual bases reasonably involved in such a decision it would be very difficult to rule as a matter of law that specific use may not be one of the bases on which like product distinctions are made. The issue at hand is essentially one to be based on the unique facts of each case.[5]

■ Third, Asocolflores argues that one industry may produce several like products. This interpretation of the controlling statute is incorrect. 19 U.S.C. § 1677(10) (1982) states, "The term 'like product' means a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this subtitle." 19 U.S. C. § 1677(4)(A) in relevant part defines industry as "the domestic producers as a whole of a like product, or those producers whose collective output of the like product constitutes a major proportion of the total domestic production of that product...." Thus, the like product determination is the industry determination.

The parties to this action took various positions in the underlying proceedings on the like product issue. Petitioners indicated that all seven flowers were one distinct like product because they were the most commonly used flowers in commercially sold arrangements, but they alternatively opined that a finding of five industries or seven industries might be acceptable. The importing interests took a variety of positions—some in favor of the one-industry concept, some against. In its preliminary determination ITC found one domestic cut flower industry, but indicated that it expected the parties to provide more information on this issue before it arrived at a final determination. *Certain Fresh Cut Flowers from Canada, Chile, Colombia, Costa Rica, Ecuador, Israel, Kenya, Mexico, the Netherlands, and Peru.* USITC Pub. No. 1877, Inv. Nos. 303–TA–17, 18 and 701–TA–275 through 278 at 8 n. 15 (Preliminary) (Jul. 1986).[6]

It is undisputed that all cut flowers serve the same general decorative function. ITC decided, however, that the differences in specific use among the flowers were not "minor." Differences in use were attributable to both differences in appearance (shape, size, color, stem length)[7] and difference in life span. An example of a non-minor specific use difference was the use of standard carnations as boutonnieres. There was, however, no indication that this accounts for a large part of the carnation

---

5. As an example, both sides cite *Fresh Cut Roses from Colombia,* USITC Pub. No. 1575, Inv. No. 731–TA–148 (Sep. 1984) in support of their positions. In that case, domestic rose producers were found to constitute the relevant industry, and roses were not found to be like all other domestically produced cut flowers. On the other hand, miniature roses and long stemmed roses, apparently without argument, were found to be part of the same like product. The result merely demonstrates that each finding as to like product must be based on the particular record at issue including the arguments raised by the parties.

6. ITC specifically suggested in its preliminary determination that it wished to consider in its final investigation whether there is a separate domestic product like each of the imported flowers, as well as whether other fresh cut flowers can or should be excluded from the like product on the basis of differences in their particular characteristics and uses.

7. Apparently color and stem length were considered important in the context of the overall differences in appearance among flower types, but were not by themselves sufficient to cause further break-out of like products within flower types.

market. Of more importance, because it involves a large portion of the market, are uses of the different flowers in commercially prepared flower arrangements. Testimony regarding flower arrangements indicated that there was little substitutability of line flowers, e.g., gladiola, for round flowers, e.g., carnations, chrysanthemums, and gerberas, or of either for filler flowers, e.g., gypsophila and alstromeria. Of course, this does not indicate that carnations cannot be substituted for gerberas in arrangements, but the testimony also indicated that at the wholesale level only substitutability within a flower type was likely.

ITC also said that it examined such usual indicators of like product as common production facilities and channels of distribution. There was no cited information on differing channels of distribution by flower type. ITC noted that six of the flowers usually were produced in greenhouse type facilities, while gypsophila is field grown. The court reviewed the domestic producer questionnaires which bore out this conclusion and provided other useful information. Although gypsophila was not the subject of a great many questionnaires, as often as not, the relevant responses indicated it was produced with other flowers not under investigation. Alstromeria and gerberas were rarely discussed. Standard carnations were often produced by the same growers who produced miniature carnations, to the exclusion of other flower types. To a lesser degree, standard and pompon chrysanthemums were produced together.[8]

■ Although the evidence is certainly not overwhelming, given the difficulties of reaching any like product determination and looking at the record as a whole, including differences in appearance, life span, low substitutability at the wholesale level and lack of commonality among producers, the court finds ITC could properly find that carnations, chrysanthemums and gerberas are not like each other. Based on these factors as well as further differences in use and production facilities ITC also could properly find that these three are not like alstromeria or gypsophila. The court does not know if any of the seven flowers are like any other particular flowers produced by the domestic cut flower industry, but unless a specific allegation was raised to that effect in a timely manner during the investigation, ITC is not required to investigate other individual flower types to determine if they are to be included in the same like product category as one of the seven. ITC is not required to investigate every possibility.

On the other hand, the court has found little in the record to differentiate miniature from standard carnations or pompon from standard chrysanthemums. Both types of carnations seemed to be produced together. Carnations and chrysanthemums are often discussed in general terms in the staff report and by witnesses at the Commission's hearings. There is some difference in size and stem length between standard and miniature carnations and between standard and pompon chrysanthemums,[9] but it is not clear that these differences are any greater than the differences within the standard types. There was no evidence cited as to whether or not the flowers may be used in a similar manner. For example, neither pompon chrysanthemums nor miniature carnations were identified as either a round or filler type flower. If there is specific information in the record which

---

8. Another factor sometimes cited as bearing on the like product issue is similarity in price. Standard carnations are quite inexpensive, followed by the other single flowers, gerberas and standard chrysanthemums. Pompon chrysanthemums, miniature carnations, gypsophila, and alstromeria follow in approximate ascending order but the prices are per bunch for the branched and filler flowers, so that comparison is difficult. The price spread is from about an average price of fifteen to twenty cents per bloom for a standard carnation to a high alstromeria price of about four dollars per bunch.

Given the price fluctuations for the higher priced groups and the different configurations in which the different type of flowers are sold, it is difficult to make any comparison based on price, and ITC did not cite this as a determinative factor.

9. A minor difference in life span was cited in the Appendix to the decision between pompon and standard chrysanthemums. None was cited with respect to carnations.

distinguishes these products from the standard flower, it should be cited and its significance explained, or the two flowers of each type should be analyzed together. The court deems it unproductive to review Asocolflores' other claims until this threshold question is resolved. If the flower types are combined, some of the affirmative opinions may become negative. On the other hand, analysis on the basis of several like products may cause a negative determination to become positive on the threat issue.

## II. THREAT OF MATERIAL INJURY

As indicated, Floral Trade Council takes issue with ITC's negative determination with respect to threat of material injury by reason of imports of miniature carnations from Costa Rica, Ecuador, Israel, Peru, Kenya, the Netherlands and Canada. Floral Trade Council argues that ITC should have cumulated imports from all eight countries exporting miniature carnations and that, even on a non-cumulated basis, ITC's negative threat determination as to Costa Rica, Ecuador, Israel and Peru is unsupported in view of data on price effects and product shifting. Because the cumulation issue is also a threshold legal question, the court will examine it, even though it is unclear whether miniature and standard carnations should be treated as one like product.

In making its finding of causation of material injury, the first ITC majority, *supra*, p. 1167, discussed cumulated imports of the same flower from different countries. The two remaining commissioners who made only negative determinations did not cumulate because, as indicated, they found that the U.S. cut flower industry, as a whole, was not injured.[10] None of the

commissioners in the first majority chose to cumulate imports for the purpose of threat determinations, reasoning that such analysis would lead them into the "prohibited realm of speculation." USITC Pub. 1956 at 39–40; USITC Pub. 1968 at 12 n. 19. Two commissioners in the first majority, who became the dissent on ITC's negative threat determination regarding imports of miniature carnations from Costa Rica, Ecuador, Israel and Peru, did, however, qualify their refusal to cumulate with the statement that, "our analysis of the vulnerability of the domestic industry to future injury necessarily took into consideration the current impact of unfair imports on the industry." USITC Pub. 1956 at 62; *see also* USITC Pub. 1968 at 16.[11]

The first issue raised by Floral Trade Council is whether cumulation is mandatory for threat of injury determinations. The answer would appear to be "no." The Trade and Tariff Act of 1984 mandated cumulation for purposes of assessing the volume and effect of imports for the purpose of making material injury determinations. 19 U.S.C. § 1677(7)(C)(i), (ii) and (iv) (1982 and Supp. IV 1986). There is no specific provision mandating cumulation in threat investigations. In making a threat investigation, one attempts to determine if the U.S. industry is likely to be injured in the future in terms of price effects and overall impact of the relevant imports, but the determination cannot be made directly, as it can in a material injury case. In order to avoid overly speculative conclusions, Congress has directed ITC to consider specific factors in determining whether threat of injury is real and imminent. *See* 19 U.S.C. § 1677(7)(F)(i) (Supp. IV 1986) and *Alberta Gas Chemi-*

---

**10.** No one has presented arguments demonstrating that the dissent erred in its analysis, apart from the decision found to be unsupported that the relevant industry was composed of all cut flowers. When pressed at oral argument, Floral Trade Council indicated it found the decision otherwise unsupportable, but gave no specific reasons.

**11.** While the analysis of these two commissioners may be considered to be a limited form of cumulation used to assess the current (already

determined not to be injured) state of the industry, it is not cumulation in the sense described by Floral Trade Council. It does not involve speculation and it also seems to be an implicit part of the analysis of even the commissioners who did not qualify their decisions not to cumulate. One looks at the current state of an industry, in whatever manner it arrived in that condition, whether it is totally unaffected by imports or affected by imports from many sources.

*cals, Inc. v. United States,* 1 CIT 312, 323, 515 F.Supp. 780, 790 (1981).

Several of these statutory factors involve conditions in the exporting country, for example, whether production capacity has increased or is unused or underutilized, and the potential for product shifting. Others focus on conditions in the United States, such as whether U.S. inventories have increased, rather than on import volumes and price effects. Still others involve assessment of the exporting industry's or exporting country's needs or motivations, for example, whether market penetration is likely to increase or whether the expected import prices will have a depressing or suppressing effect on domestic prices. Thus, cumulation cannot be used for all phases of the threat investigation.

Floral Trade Council has suggested a method of utilizing cumulation at a certain stage of the analysis. One would look at current import volumes individually, examine the potential for increase for each country individually using the applicable factors, and project into the future. Then the projected imports would be cumulated, and price effects would be predicted. Of course, the statute does not describe this method and ITC obviously is uncomfortable with the concept of projecting specific numbers which might be cumulated, although this seems no more "speculative" than other aspects of threat analysis.

■ It seems clear that cumulation for threat cases is not mandated by statute; whether it is a useful tool to be used for some stages of the determination, at ITC's discretion, is a separate question. Although no one has argued that ITC has cumulated for threat purposes in the past, it is not prohibited from doing so in a manner that is appropriate to a particular case. If miniature carnations are treated as a separate industry, this case would not seem to be the type of case which would warrant cumulation. Assuming the commissioner is correct in expecting no significant changes in imports from the other countries, only by cumulating with Colombian imports would cumulation produce any different results. Colombian imports seem

to have such different effects from those of imports from other sources that cumulation is probably inappropriate, if past discretionary standards, are applied. As arguments of counsel suggest that ITC assumed it was forbidden from using any form of cumulation analysis, even if it found it appropriate, upon remand ITC should decide if it finds cumulation appropriate for some aspects of this threat determination.

Resolution of other issues raised by Asocolflores and Floral Trade Council awaits ITC's determination on remand which is due within 45 days. The parties shall prepare a briefing schedule within 10 days thereof.

SO ORDERED.