The **TORRINGTON COMPANY, Plaintiff,**

v.

**UNITED STATES, Defendant,**

Nippon Seiko K.K. and NSK Corp.; ICSA Industries Cuscinetti S.p.A.; NTN Corp., NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corp. and NTN Toyo Bearing Co., Ltd.; INA Bearing Co., Inc.,

INA Walzlager Schaeffler KG, INA Roulements, S.A., and INA Bearing Co., Ltd.; Koyo Seiko Co., Ltd. and Koyo Corp. of U.S.A.; Hoesch Rothe Erde Schmiedag AG and Rotek Inc.; Nippon Thompson Co., Ltd.; SKF USA, Inc., AB SKF, SKF GmbH and SKF Gleitlager GmbH, SKF France, RIV–SKF Industries, S.p.A., SKF Sverige AB, and SKF (U.K.) Limited; Caterpillar Inc.; and FAG Kugelfischer Georg Schaefer KGaA, FAG Cuscinetti S.p.A. and FAG Bearings, Corp., Defendants–Intervenors.

Court No. 89–06–00356.

United States Court of International Trade.

Sept. 11, 1990.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr. and Lane S. Hurewitz, for plaintiff.

James A. Toupin, Asst. Gen. Counsel, U.S. Intern. Trade Com'n, Stephen A. McLaughlin and Frances Marshall, for defendant.

Coudert Brothers, Robert A. Lipstein, J. Triplett Mackintosh and James G. Dwyer, for Nippon Seiko K.K. and NSK Corp.

Donovan Leisure Newton & Irvine, Pierre F. de Ravel d'Esclapon, for ICSA Industries Cuscinetti S.p.A.

Barnes, Richardson & Colburn, Robert E. Burke, Donald J. Unger, Brian F. Walsh and Jesse M. Gerson, for NTN Corp., NTN Bearing Corp. of America, American NTN Bearing Mfg. Corp. and NTN Toyo Bearing Co., Ltd.

Katten Muchin Zavis & Dombroff, Thomas A. Rothwell, Jr., Joseph A. Vicario, Jr., James M. Lyons and Alfred G. Scholle, for INA Bearing Co., Inc., INA Walzlager Schaeffler KG, INA Roulements, S.A., and INA Bearing Co., Ltd.

Powell, Goldstein, Frazer & Murphy, Peter O. Suchman and Neil R. Ellis, for Koyo Seiko Co., Ltd. and Koyo Corp. of U.S.A.

Hogan & Hartson, Lewis E. Leibowitz, Walter A. Smith, Jr. and David W. Phillips,

for Hoesch Rothe Erde Schmiedag AG and Rotek Inc.

Gibson, Dunn & Crutcher, Joseph H. Price and Naoyuki Agawa, for Nippon Thompson Co., Ltd.

Howrey & Simon (Herbert C. Shelley and Jennifer Rie) for SKF USA, Inc., AB SKF, SKF GmbH and SKF Gleitlager GmbH, SKF France, RIV–SKF Industries, S.p.A., SKF Sverige AB, and SKF (U.K.) Ltd.

Powell, Goldstein, Frazer & Murphy (Peter O. Suchman, Neil R. Ellis and T. George Davis, Jr.) for Caterpillar Inc.

Adduci, Mastriani, Meeks & Schill (Louis S. Mastriani, Barbara A. Murphy, Ralph H. Sheppard and Cathy S. Neuren for FAG Kugelfischer Georg Schaefer KGaA, FAG Cuscinetti S.p.A. and FAG Bearings Corp.

## OPINION

TSOUCALAS, Judge:

Plaintiff brings this action pursuant to Rule 56.1 of the Rules of this Court to challenge the finding by the International Trade Commission ("ITC" or "Commission") of six separate "like products" and "domestic industries" in its investigations of antidumping and countervailing duty injuries involving imports of antifriction bearings. *Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom*, USITC Pub. 2185, Inv. Nos. 303–TA–19 and 20 and 731–TA–391–399 (May 1989) ("Final Determinations").[1] This Court's jurisdiction is based on 28 U.S.C. § 1581(c) (1988).

### Background

Torrington filed an antidumping and countervailing duty petition on March 31, 1988 on behalf of the domestic industry which produces antifriction bearings. In the petition, Torrington described one class or kind of merchandise, to wit, all antifriction bearings (except tapered roller bearings). Torrington also requested that the ITC find a single like product and a single domestic industry.

In May, 1988, the ITC issued a preliminary determination which stated that there was reason to believe that six domestic industries were materially injured, or threatened with such injury, because of unfairly imported bearings from nine countries. *Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom*, USITC Pub. 2083, Inv. Nos. 303–TA–19 and 20 and 731–TA–391–399 (May 1988) ("Preliminary Determinations"). The Commission differentiated among bearings based on the type of rolling element each bearing contains. As a result, the ITC found that each of the following comprised a different like product produced by a different industry: (1) ball bearings; (2) spherical roller bearings; (3) cylindrical roller bearings; (4) needle roller bearings; (5) plain bearings; and (6) other antifriction devices, such as ball screws and linear guides. *Id.* at 22.

The Commission issued its final determinations in May 1989 and found that there were six like products. USITC Pub. 2185. Five of the like products corresponded to the classes or kinds of merchandise found by the International Trade Administration ("ITA"); they are ball bearings, spherical roller bearings, cylindrical roller bearings, needle roller bearings and plain bearings. However, the Commission found that slewing rings constituted a separate, sixth, like product:

Subsequently, the ITC rendered negative injury determinations for spherical roller bearings, needle roller bearings and slewing rings, and affirmative determinations for ball bearings, cylindrical roller bearings and spherical plain bearings. *Final Determinations* at 7. Plaintiff asserts that the Commission's approach "substantially narrowed the scope of the ultimate antidumping and countervailing duty orders, and

1. Though plaintiff's Complaint lists eleven counts, this opinion concerns only Counts 1 and 2, that is, those dealing with the Commission's like product determinations.

thereby adversely affected Torrington." *Memorandum of Points and Authorities in Support of the Torrington Company's Motion for Partial Summary Judgment on the Agency Record* at 8 ("Plaintiff's Memorandum").

## Discussion

### I. ITC's Authority to Determine Like Products

Torrington contends that the ITC must accept the definition of like product and domestic industry provided by the petition, and does not possess the authority to modify that description.

The Commission is authorized by statute to make a determination based on the evidence before it as to whether a domestic industry has been materially injured (or is threatened with such injury) by reason of imports at less than fair value ("LTFV"). 19 U.S.C. § 1673b(a)(1) (1988). The imports under investigation must cause material injury or threaten such injury to a domestic industry which produces like products, that is, products which are "like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this subtitle." 19 U.S.C. § 1677(10) (1988).

■ Torrington's complaint is that the ITC should have made its determination based on Torrington's assertion that all antifriction bearings (except tapered roller bearings) constitute one like product and one domestic industry. It is well settled that the ITC has the authority to determine whether or not one or more domestic industries have been injured by reason of LTFV imports. This Court repeatedly has upheld the ITC when its determinations have deviated from the contentions made in the petition, provided those determinations were supported by substantial evidence. *Roquette Freres and Roquette Corp. v. United States*, 7 CIT 88, 93, 583 F.Supp. 599, 603 (1984); *Kenda Rubber Indus. Co. v. United States*, 10 CIT 120, 123, 630

F.Supp. 354, 357 (1986); *Mitsubishi Elec. Corp. v. United States*, 12 CIT ——, ——, 700 F.Supp. 538, 563 (1988), *aff'd*, 898 F.2d 1577 (Fed.Cir.1990).

■ Plaintiff also claims that the ITC's like product determination must be consistent with the ITA's class or kind finding. *Plaintiff's Memorandum* at 14. It is settled law that the ITC's like product determination is separate and distinct from the ITA's determination of the class or kind of merchandise. *See Mitsubishi*, 898 F.2d at 1584. While the ITC does not have the authority to modify the ITA's finding of class or kind, it has the right to make its own determination as to what should be considered a like product. *Badger–Powhatan v. United States*, 9 CIT 213, 217, 608 F.Supp. 653, 657 (1985). Inconsistencies in the agencies' determinations are not, *per se*, contrary to law. Indeed, the possibility that they will reach inconsistent conclusions is "built into the law." *Algoma Steel Corp. v. United States*, 12 CIT ——, ——, 688 F.Supp. 639, 642 (1988), *aff'd*, 865 F.2d 240 (Fed.Cir.1989), *cert. denied*, —— U.S. ——, 109 S.Ct. 3244, 106 L.Ed.2d 590 (1989). Hence, the ITC was within its discretion when it found that there were six different like products in the instant investigation.

### II. ITC's Interpretation of "Like Product"

■ Torrington also asserts that the Commission "applied an impermissibly narrow construction of the 'like product' and industry." *Plaintiff's Memorandum* at 23.[2] In support of its position, Torrington cites the legislative history to the Trade Agreements Act of 1979, which states that

[t]he requirement that a product be "like" the imported article should not be interpreted in such a narrow fashion as to permit minor differences in physical characteristics or uses to lead to the conclusion that the product and article are not "like" each other, nor should the definition of "like product" be interpret-

---

**2.** The determinations of like product and domestic industry are inextricably intertwined, since industry is defined in terms of like product. Hence, "the like product determination is

the industry determination." *Asociacion Colombiana de Exportadores de Flores v. United States*, 12 CIT ——, ——, 693 F.Supp. 1165, 1169 (1988).

ed in such a fashion as to prevent consideration of an industry adversely affected by the imports under investigation. S.Rep. No. 249, 96th Cong., 1st Sess. 90–91, *reprinted in* 1979 U.S.CODE CONG. & ADMIN.NEWS 381, 476–77. Essentially, plaintiff is contending that, in finding that there were six like products in the investigation of antifriction bearings, the Commission "impermissibly" relied on minor differences in characteristics and uses.

It appears that plaintiff has misunderstood the mandate of the statute and its legislative history. The Senate Report cited above warns against permitting minor differences between domestic products and imported articles from keeping them from being compared to *each other*. In the present action, the ITC has found distinctions "*among* the domestic products, not *between* domestic products and imported products." *Defendant's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment* at 83 ("Defendant's Memorandum") (emphasis in original).

Nonetheless, there is no question that differences exist among antifriction bearings. Whether the differences among the various bearings are minor or significant is a factual issue for the Commission to decide. This Court recently held that "[i]t is up to [the] ITC to determine objectively what is a minor difference." *Exportadores*, 12 CIT at ——, 693 F.Supp. at 1169. Provided the determination is reasonable and supported by the evidence, the Court will affirm the Commission. Given the vast differences among the products investigated by the ITC, it would be impossible for the Court to give specific directives as to what would constitute a minor difference.[3] The issue for the Court is whether the evidence used by the ITC to make its determination rises to the level of substantial evidence and supports the conclusion.

### III. Substantial Evidence

The Court will uphold a determination by the Commission unless it is not supported by substantial evidence in the administrative record or is otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988). A decision by the ITC will not be overturned merely because the Court would have decided the issue differently, had the issue come before the Court *de novo*. *Mitsubishi*, 12 CIT at ——, 700 F.Supp. at 558; *SCM Corp. v. United States*, 4 CIT 7, 10, 544 F.Supp. 194, 197 (1982). The function of the Court is to determine whether there is substantial evidence to support the ITC's conclusions.

In making its determination as to what domestic products constitute like products, the ITC considers similar, but not identical, factors to those considered by the ITA in its class or kind determination.[4] These consist of "(1) physical appearance, (2) interchangeability, (3) channels of distribution, (4) customer perception, (5) common manufacturing facilities and production employees, and where appropriate, (6) price." *Final Determinations* at 11.[5] The use of these factors by the ITC in its like product determinations has been upheld by this Court. *Exportadores*, 12 CIT at ——, 693 F.Supp. at 1169–70.

---

3. In *Exportadores*, the Court affirmed the ITC's determination that the differences among carnations, chrysanthemums and gerberas were not minor and thus those flowers were separate like products. 12 CIT at ——, 693 F.Supp. at 1170. But in *Sony Corp. of America v. United States*, the Court found that Trinitron color picture tubes were not separate like products from other color picture tubes, despite certain unique qualities. 13 CIT ——, ——, 712 F.Supp. 978, 983 (1989). These dissimilar results demonstrate that every like product determination "must be based on the particular record at issue" and the "unique facts of each case." *Exportadores*, 12 CIT at ——, 693 F.Supp. at 1169.

4. The criteria upon which Commerce relies include "the general physical characteristics of the merchandise, the expectation of the ultimate purchasers, the channels of trade in which the merchandise moves, the ultimate use of the merchandise, and cost." *Diversified Prods. Corp. v. United States*, 6 CIT 155, 162, 572 F.Supp. 883, 889 (1983).

5. Price was not considered by the Commission to be an appropriate factor in this investigation.

In the final determinations in the present action, the ITC determined that antifriction bearings did not all comprise one like product. Rather, the Commission distinguished the bearings on the basis of the rolling element each type of bearing contains, and found that the bearings actually constitute six like products. *Final Determinations* at 33. The six like products found by the Commission are: (1) ball bearings, (2) spherical roller bearings, (3) cylindrical roller bearings, (4) needle roller bearings, (5) plain bearings, and (6) slewing rings.[6]

The Commission's final determinations examine the differences among antifriction bearings due to different rolling elements, using the six criteria outlined above. The Commission found that most of the products within the scope of the investigation share four physical characteristics. They are an inner ring, an outer ring, some kind of rolling element and a cage or separator which holds the rolling elements in place.[7] Furthermore, all bearings function to reduce friction between moving parts and are manufactured by the same processes. *Id.* at 15.

However, the Commission concluded that those similar characteristics did not, in and of themselves, determine the character of a bearing. Instead, the Commissioners found that within the category of antifriction bearings there are separate like products depending on the type of rolling element in the bearing. This is due to the fact that "[t]he type of rolling element, or lack of a rolling element, is the key physical characteristic that determines the functional capability of the bearing and the use to which it is put." *Id.* at 16–17.

The differing physical characteristics for ball bearings, spherical roller bearings, cylindrical roller bearings, needle roller bearings and spherical plain bearings are discussed at length by the Commission. *Id.* at A–4—A–12. Ball bearings have ball-shaped rolling elements while cylindrical roller bearings contain cylindrical rollers. Needle roller bearings also have cylindrical roller elements, but have a higher length-to-diameter ratio than cylindrical roller bearings. Spherical roller bearings employ spherical rollers. Finally, spherical plain bearings do not have balls or rollers; they "consist of a spherically shaped inner ring that is self-aligning in an outer ring." *Id.* at A–4.

■ Slewing rings, which were added to the ITA investigation late in the process, were found by the ITC to constitute a sixth like product. *Id.* at 18–20. The evidence distinguishing slewing rings from the other bearings is substantial. Slewing rings have inner and outer rings and balls or rollers but normally are considerably larger than other bearings. Unlike other bearings, they also contain gears, cut on either the inner or outer ring. *Id.* at 100.

Slewing rings are used primarily in heavy equipment and "perform a 'turntable' function in cranes, tank turrets, radio telescopes, hoisting equipment, and the like." *Id.* at 19. For instance, slewing rings can support both the load hanging from a crane as well as radial and thrust loads, while other bearings "cannot accommodate tilting loads." *Id.* at B–40. Also, they are custom made for each end user and therefore are sold almost exclusively to end users, making their channels of distribution distinct from those of other bear-

---

**6.** Differences among the first five types of bearings were enumerated and discussed extensively in *The Torrington Co. v. United States,* 14 CIT ——, 745 F.Supp. 718, Slip Op. 90–73 (Aug. 3, 1990), wherein this Court upheld Commerce's determination that those five categories of bearings constituted five different classes or kinds of merchandise. Slewing rings were included in the scope of Commerce's final determination but without explanation as to which class or kind they belonged. The ITC, however, determined that slewing rings constitute a separate like product. *Final Determinations* at 20.

**7.** It should be noted that Torrington's own Industry Manager acknowledged that most needle roller bearings do not have an outer ring, and its counsel admitted that spherical plain bearings do not have a rolling element. *See Transcript of Conference Before Director of Operations* (Apr. 21, 1988), Administrative Record (Public) Doc. 46 at 15, 103 ("Conference Transcript"). Hence, the contention that all antifriction bearings contain all four characteristics is subject to multiple exceptions.

ings. Because of their atypical applications and designs, slewing rings are differentiated from other bearings in the perceptions of customers as well. Equally as important, slewing rings are produced one at a time, whereas other bearings normally are mass-produced on assembly lines. *Id.* at 101. Accordingly, the Court holds that the Commission's determination that slewing rings constitute a separate like product is supported by substantial evidence.

■ As for the other factors considered by the ITC, the evidence indicates that interchangeability of bearings at the design stage is extremely limited. *Id.* at 17. For instance, as the buyer for Caterpillar, Inc., a major purchaser of antifriction bearings, explained, "there is no way that the ball bearings which are needed for alignment, not load carrying, could be used instead of needle bearings, which have high load bearing capacity for small envelope size."[8] *Conference Transcript* at 184 (testimony of Michael Dykstra). While some interchangeability is a theoretical possibility, in reality substitution of one type of bearing for another requires redesign of the product to conform it to the new bearing's functional capabilities. The evidence convincingly supports the conclusion that the six like products are not commonly interchangeable.

■ The third factor is the channels of distribution for the bearings. Plaintiff contends that the evidence demonstrates that "the channels of distribution, whether to [original equipment manufacturer] buyers or replacement distributors are the same for different types of bearings." *Plaintiff's Memorandum* at 65. There is evidence that bearings are marketed through one of two channels, direct sales to end users or through independent distributors to the end users.[9] *Defendant's Memorandum* at 102. But there is little evidence to support the Commission's conclusion that bearings move through different channels of distribution based on their rolling elements.[10]

■ At least one foreign maker of bearings, NSK Corp., admitted that no such distinction is made in the distribution channels of bearings. *Pre–Hearing Brief of Nippon Seiko K.K. (NSK)*, AR (Pub.) Doc. 412 at 5. While catalogues and price lists may be segregated by type of bearing, the channels through which bearings are distributed are not. However, the fact that one of the six criteria does not support the determination is not dispositive. *Exportadores*, 12 CIT at ——, 693 F.Supp. at 1170. If the balance of the evidence constitutes substantial evidence, then the determination will be affirmed.

■ The next factor considered by the ITC is customer perceptions. Torrington asserts that "[a]ll customers expect the bearings they purchase will function to reduce friction between moving parts." *Plaintiff's Memorandum* at 62. Such a broad and all-inclusive description of customer perceptions might be expected from a casual, superficial observer, but it is not a credible statement from a member of the industry.

If a purchaser of parts for heavy construction equipment considered ball bearings to be equivalent to spherical plain bearings, it is difficult to imagine that purchaser would remain on the job for long. The testimony of Caterpillar's buyer makes this point perfectly clear. He states that "[c]ertain bearings are required to perform certain mechanical tasks. And the limita-

---

**8.** Caterpillar's buyer added that "engineers agree that it is ludicrous to suggest that bearings of different types are readily substitutable." *Conference Transcript* at 184.

**9.** The government has proffered much evidence indicating that price lists and catalogues furnished by distributors are marketed in groups based on the type of rolling element they contain. *See* price lists attached to petition, AR (Pub.) Doc. 1. Price lists and catalogues do not, however, reflect whether the goods move through common channels of distribution. They merely reflect marketing and advertising technique, a factor which was not stated by the ITC as a consideration in its like product determination.

**10.** For example, there is no evidence that ball bearings are sold directly to end users while needle roller bearings are sold through distributors. The exception is slewing rings, which, as discussed above, generally are sold directly to end users.

tions imposed by a dimension on capacity strengths dictate which bearing must be used for a specific application." *Conference Transcript* at 184. Clearly, purchasers of bearings are aware of the differences among bearings and their functional capabilities.

■ Lastly, the Commission examined the manufacturing facilities, equipment and processes used in the production of antifriction bearings. The Commission found that "many producers make only one type of bearing," but even those who make more than one type generally used a separate manufacturing facility for different types of bearings. *Final Determinations* at 17. Plaintiff argues that antifriction bearings share "common manufacturing facilities, equipment and production employees." *Plaintiff's Memorandum* at 68.

The record indicates that "[m]any companies rationalize their production by size, precision, and/or type of rolling element." *Final Determinations* at A–18. Thus, plaintiff claims, the rolling element is not the only distinguishing feature in the rationalization of bearings production. Yet, of those producers who make more than one type of bearing, only the petitioner reported common manufacturing facilities for assorted types of bearings.

At the Commission Hearing, NSK's spokesman went so far as to criticize Torrington for its common production facilities because of the advantages in capacity utilization of "dedicated equipment that produces a particular type of bearing within a very small size range." *Transcript of Hearing Before Commissioners Cass, Newquist, Eckes, Lodwick and Rohr* ("Hearing Transcript") (March 30, 1989) at 207–08 (testimony of Bob Komasarer). He added that "[y]ou would not see that in Japan ... [or] Europe." The President of SKF confirmed that his company's domestic facilities "are in fact dedicated" to producing one type of bearing each. *Id.* at 211 (testimony of Raymond B. Langton). INA's Chief Executive Officer concurred,

asserting that INA has separate plants for ball bearings, cylindrical roller bearings and needle bearings. *Id.* (testimony of Guenter Maschkiwitz).

This argument was further buttressed by NTN's Marketing and Sales Manager who maintained that "you never produce a ball bearing on a needle bearing line or produce a spherical bearing on a ball bearing line. All of the equipment is specially designed for just that production line." *Conference Transcript* at 151 (testimony of Eric Rasmussen). Hence, while some factories may produce more than one type of bearing, there is substantial evidence to support the conclusion that within a factory, separate facilities are used for different bearings based on their rolling elements.[11]

The production of antifriction bearings involves four major processing steps which are the same for all the bearings subject to this investigation. They are: green machining, heat treating, finishing, and assembly and inspection. *Final Determinations* at A–15. The Commission explained that the same green machining equipment may be used to manufacture the components of several different types of bearings. *Id.* at A–17. This is because the size and the form of raw material (not the type of bearing) are the key factors that determine the type of machine to be used for green machining. Also, the same heat treatment machinery is used for all types of bearings, except tapered roller bearings.

It is in the finishing and assembly stages that there are significant distinctions based on the type of bearing. Finishing consists of grinding (and sometimes, honing) the bearing components. In grinding, "most machines are specifically designed for one or two types of bearings, although certain machines can be used to grind a wider variety of bearing types." *Id.* Nevertheless, the grinding *process* is distinct for each type of bearing.

The evidence in the record indicates that the manufacturing facilities and equipment used to produce the six like products found

---

**11.** Defendant maintains that "the separation of production lines [is what] was critical to the Commission's like product analysis, not the fact that separate production lines might be under one roof." *Defendant's Memorandum* at 106–07.

by the ITC differ at certain levels on the basis of the rolling element. While the same machinery may be used at certain stages of production for different types of bearings, there is substantial evidence to support the conclusion that, in general, the facilities and equipment are different. It is clear, however, that the same processing *steps* are used in the manufacture of all antifriction bearings subject to this investigation.

■ The finding of some similarities among the products delineated by the Commission is not sufficient to overturn the determinations when there is otherwise substantial evidence to support its findings. Substantial evidence does not require that the overwhelming weight of the evidence support the Commission's conclusions. *Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1563 (Fed.Cir.1984); *Matsushita Elec. Indus. Co. v. United States,* 750 F.2d 927, 936 (Fed.Cir.1984); *Exportadores,* 12 CIT at ——, 693 F.Supp. at 1170. It requires that the evidence be more than a "mere scintilla." *Matsushita,* 750 F.2d at 933. Undeniably, that standard has been met in this case.

### Conclusion

The administrative record in the present action contains substantial evidence to support the Commission's determinations. The evidence is convincing that there were considerable differences among the six like products in physical appearance, interchangeability, customer perceptions, and manufacturing facilities and equipment. The various bearings share only common channels of distribution and processing steps. The Court therefore holds that the determinations that ball bearings, spherical roller bearings, cylindrical roller bearings, needle roller bearings, spherical plain bearings and slewing rings are separate like products are supported by substantial evidence and are otherwise in accordance with the law. Accordingly, those determinations of the ITC are affirmed.

## JUDGMENT

Plaintiff having moved this Court pursuant to Rule 56.1 of the Rules of this Court for partial summary judgment upon the agency record as to Counts 1 and 2 of its Complaint, the defendant having opposed same, and the Court, after due deliberation, having rendered a decision herein; now then, in conformity with said decision, it is hereby

ORDERED that plaintiff's motion for partial summary judgment upon the agency record as to Counts 1 and 2 of plaintiff's Complaint is denied, and accordingly, those counts are hereby dismissed. It is further

ORDERED that, pursuant to Rule 54(b) of the Rules of this Court, this is a final judgment as to Counts 1 and 2 of plaintiff's Complaint and there is no just reason for delay in the entry of an actionable final judgment.