NEC CORPORATION and HSNX Supercomputers, Inc.,

and

Fujitsu Limited and Fujitsu America, Inc., Plaintiffs,

v.

DEPARTMENT OF COMMERCE & U.S. International Trade Commission, Defendants,

Cray Research, Inc., Defendant–Intervenor.

Slip Op. 98–164.
Court No. 97–11–01967.

United States Court of International Trade.

Dec. 15, 1998.

Akin, Gump, Strauss, Hauer & Feld, L.L.P. (Warren E. Connelly and James E. Mendenhall) for Plaintiffs Fujitsu Limited and Fujitsu America, Inc.

Paul, Weiss, Rifkind, Wharton & Garrison (Robert E. Montgomery, Jr., Terence J. Fortune, Robert P. Parker, David J. Weiler, and Swati Agrawal) for Plaintiffs NEC Corporation and HNSX Supercomputers Inc.

Lyn M. Schlitt, General Counsel; James A. Toupin, Deputy General Counsel; Cynthia P. Johnson, Office of the General Counsel, U.S. International Trade Commission, Counsel for Defendant.

Wilmer, Cutler & Pickering (John D. Greenwald, Ronald I. Meltzer, Juan Millan) for Defendant–Intervenor Cray Research, Inc.

## OPINION

POGUE, Judge.

This action is before the Court on the motions of Plaintiff Fujitsu Limited and Fu-

jitsu America ("Fujitsu"), Inc., and NEC Corporation and HNSX Supercomputers Inc. ("NEC"), ("collectively Plaintiffs") for judgment on the agency record pursuant to US-CIT Rule 56.2. The Plaintiffs, respondents in the underlying investigation, filed separate actions challenging certain aspects of the final determination of the U.S. International Trade Commission ("ITC" or "Commission"), in *Vector Supercomputers From Japan,* USITC Pub. No. 3062, Inv. Nos. 731–TA–750)(Oct. 1997)("Views"). The actions were consolidated. The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c)(1994).

Specifically, the parties challenge the Commission's determination that vector supercomputers are a separate like product and that the industry in the United States producing "vector supercomputers" is threatened with material injury by reason of imports from Japan that are sold at less than fair value ("LTFV").

### Background

On July 29, 1996, Cray Research, Inc., filed a petition with the Department of Commerce ("Commerce") alleging that vector supercomputers from Japan are being, or are likely to be sold in the United States at less than fair value, and that such imports are materially injuring, or threatening material injury to an industry in the United States. *Vector Supercomputers From Japan,* 61 Fed.Reg. 43,527 (Dep't Commerce 1996)(initiation antidumping duty investig.).

Commerce published a preliminary determination, *Vector Supercomputers From Japan,* 62 Fed.Reg. 16,544 (Dep't Commerce 1997)(prel.determination), and a final determination, *Vector Supercomputers From Japan,* 62 Fed.Reg. 45,623 (Dep't Commerce 1997)(final determination), concluding that imports of vector supercomputers from Japan were being sold at LTFV in the United States.

On October 16, 1997, the ITC promulgated its final injury determination, concluding that the domestic industry is threatened with material injury by reason of LTFV imports from Japan of vector supercomputers. *Vector Supercomputers From Japan,* 62 Fed. Reg. 53,801 (Int'l Trade Commission 1997). The Commission, however, found no present material injury. *Id.*

Commerce published an antidumping duty order covering the subject merchandise on October 24, 1997. *Vector Supercomputers From Japan,* 62 Fed.Reg. 55,392 (Dep't Commerce 1997)(notice antidumping duty ord.). The margin found for Fujitsu was 173.08%. The margin found for NEC was 454%. *Id.* at 55,393.

### Standard of Review

■ The Court will uphold a determination by the Commission unless it is not supported by substantial evidence in the administrative record or is otherwise not in accordance with law. *See* Section 516a(b)(1)(B)(i) of the Tariff Act of 1930, *as amended,* 19 U.S.C. § 1516a(b)(1)(B)(i)(1994).

### Discussion

### I. Like Product

■ To determine whether an industry in the United States is materially injured or threatened with material injury by reason of imports of the subject merchandise, the ITC must first define the "domestic like product" and the "industry" producing the product. *See* 19 U.S.C. §§ 1673(2), 1677(4) & 1677(10)(1994).[1]

Section 1677 defines "domestic like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation." 19 U.S.C. § 1677(10). In turn, the relevant "industry" is defined as the "producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic pro-

---

**1.** As the proceeding under review was commenced after January 1, 1995, the applicable statutory provisions are those amended by the Uruguay Round Agreements Act ("URAA"). The Court notes that several cases cited in the opinion where governed by the pre-URAA version of the antidumping statute. The sections of the statute referred to, however, were not changed in relevant part. *Cf.* 19 U.S.C. § 1677(10)(1988) with 19 U.S.C. § 1677(10)(1994); *cf.* 19 U.S.C. § 1677(7)(A)&(F)(1988) with § 1677(7)(A)&(F)(1994).

duction of the product." 19 U.S.C. § 1677(4)(A).

In the final determination, Commerce defined the products under investigation as:

[A]ll vector supercomputers, whether new or used, and whether in assembled or unassembled form, as well as vector supercomputer spare parts, repair parts, upgrades, and system software, shipped to fulfill the requirements of a contract entered into on or after April 7, 1997, for the sale, and, if included, maintenance of a vector supercomputer. A vector supercomputer is any computer with a vector hardware unit as an integral part of it central processing unit boards.

62 Fed.Reg. at 45,624.

■ The Commission's decision regarding the appropriate domestic like product is a factual determination, where the Commission applies the statutory standard of "like" or "most similar in characteristics and uses" on a case-by-case basis. *See e.g., Torrington Co. v. United States,* 14 CIT 648, 652, 747 F.Supp. 744, 749 n. 3 (1990), *aff'd,* 938 F.2d 1278, (Fed.Cir.1991); *Asociacion Colombiana de Exportadores de Flores v. United States,* 12 CIT 634, 638, 693 F.Supp. 1165, 1169 n. 5 (1988). Although the Commission must accept the determination of Commerce as to the scope of the imported merchandise sold at less than fair value, the Commission determines what domestic product is like the imported articles Commerce has identified. *See Makita Corp. v. United States,* 21 CIT ——, ——, 974 F.Supp. 770, 783 (1997).

The ITC has generally sought "clear dividing lines" between product groups. *See e.g., Aramide Maatschappij V.O.F. v. United States,* 19 CIT 884, 885 (1995); *Nippon Steel Corp. v. United States,* 19 CIT 450, 455 (1995). Factors that the ITC typically considers in defining "like product" include: (1) physical appearance, (2) interchangeability, (3) channels of distribution, (4) customer perceptions, (5) common manufacturing facilities and production employees, and where appropriate, (6) price. *See Torrington Co.,* 14 CIT at 652, 747 F.Supp. at 749.

As a preliminary matter, Plaintiffs argue that the Commission erred in failing to apply its own "clear dividing line" standard in this case. Fujitsu Mem. Supp. Mot. J. Agency R. ("Fujitsu Brief") at 13; NEC Mem. Supp. Mot. J. Agency R. ("NEC Brief") at 14. Alternatively, Fujitsu maintains that even if the ITC applied its "clear dividing line" standard here, the Commission was required to focus on the characteristics and uses of imports that serve the mid-range market because differences between products at either end of a continuum are not enough to create a bright line between them. Fujitsu Brief at 13. The Court does not agree.

First, the Commission specifically noted that it looks for "clear dividing lines" among "possible like products and disregards minor variations." Views at 4. The Commission recognized that "the constant evolution of all computers in general and supercomputers in particular makes a concrete, measurable differentiation" between various products difficult. *Id.* at 6. Nevertheless, it concluded that, "[b]ased on the differing physical characteristics and end uses, lack of or limited interchangeability for many applications, and producer and customer perceptions, we find that there is a clear dividing line between vector supercomputers and all other supercomputers, and therefore, we define the domestic like product as vector supercomputers." *Id.* at 21.

Second, section 1677(10) provides that the term "domestic like product" means a product which is "like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation." 19 U.S.C. § 1677(10). Further, the legislative history states that, "[t]he requirement that a product be 'like' the imported article should not be interpreted in such a narrow fashion as to permit minor differences ... to lead to the conclusion that the [domestic] products and [the imported] article are not 'like' each other ...." S.Rep. No. 249, 96th Cong. 1st Sess. 90–91 (1979). The focus here is on the product produced in the United States that is *most similar* to the imports under investigation. *See* 19 U.S.C. § 1677(10) (emphasis provided). Accordingly, in this case the Commission appropriately focused its investigation on the continuum of domestic products most like the subject Japanese imports.

The Commission's determination, however, must also be supported by substantial evidence. Plaintiffs argue that the record does not support the Commission's findings. Fujitsu Brief at 14; NEC Brief at 2.

The ITC concluded that the domestic like product was vector supercomputers only rather than all supercomputers as argued by the Plaintiffs in the underlying administrative proceeding. Views at 21. The Commission based its decision primarily on: (1) the differences in physical characteristics between vector supercomputers and non-vector supercomputers; (2) the difficulty in modifying software applications "optimized" for vector supercomputers for similarly optimal use in non-vector supercomputers; (3) customer and producer perceptions; and, (4) price differences. *Id.* at 18–19, 21.

In reviewing the Commission's like product findings under the substantial evidence test, it is not the province of the courts to change the priority of the relevant like product factors or to reweigh or judge the credibility of conflicting evidence. *See Iwatsu Elec. Co. v. United States,* 15 CIT 44, 47, 758 F.Supp. 1506, 1509 (1991). "It is within the Commission's discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence." *Maine Potato Council v. United States,* 9 CIT 293, 300, 613 F.Supp. 1237, 1244 (1985).

Furthermore, the relevant case law demonstrates that the Commission has broad discretion in determining whether a particular difference or similarity is minor. For example, in *Asociacion Colombiana,* the Court affirmed the ITC's determination that the differences among carnations, chrysanthemums and gerberas were not minor and thus those flowers were separate like products. 12 CIT at 640, 693 F.Supp. at 1170. But in *Sony Corp. of America v. United States,* the court upheld the Commission's determination to include the Trinitron color picture tube in the like product finding with all other picture tubes despite certain unique qualities. 13 CIT 353, 359, 712 F.Supp. 978, 983 (1989). These dissimilar results demonstrate that every like product determination must be based on the particular record at issue and the unique facts of each case. *See Asociacion Colombiana,* 12 CIT at 638, 693 F.Supp. at 1169 n.5.

The Court addresses the parties challenges according to the factors as considered by the Commission in making its determination.

### 1. Physical Characteristics and End-Uses

The Commission found that "the presence or absence of a vector processor imparts an important and clear physical characteristic to a supercomputer. Vector supercomputers have hardware specially designed to process data in groups called vectors, whereas non-vector machines process data in parallel." Views at 8. The Commission determined that vector hardware allows processing of many data items as a group rather than individually and permits the system to operate on more than one instruction at the same time. *Id.* at 8–9.

Further, the Commission found that vector supercomputers require custom processing elements or processing elements with a very high degree of customization. *Id.* at 9. Non-vector supercomputers use commodity chips with little or no customization. *Id.* The Commission noted that vector supercomputers have custom processing elements that number only in the 10s, whereas in non-vector supercomputers the processing units can number in the hundreds. *Id.* at 8.

In contrast, the Commission found that non-vector systems vary widely among themselves in architecture, internal communications systems, memory structure, performance and application, and encompass a broad array of products. *Id.* The Commission concluded that these differences prevent programming for one type of parallel processing computer from being compatible with other configurations. *Id.* Notwithstanding these differences, the Commission determined that non-vector supercomputers are similar in possessing multiple processing elements and often use commodity logic chips with little or no customization. *Id.*

With respect to end-use, the Commission found that although all supercomputers are generally used for the same purposes, i.e., to perform complex calculations, that for certain end-use applications a vector supercomputer provides the best computing solutions. *Id.* Further, in certain areas within end-use categories shifting from a vector to a non-vector supercomputer involves considerable difficulty and mixed performance results. *Id.* at 10. Finally, the Commission noted that the fact that end-users reported purchasing both vector and non-vector systems at the same time further suggests that the different systems provide distinct benefits. *Id.*

Both Fujitsu and NEC contend that no bright line can be drawn between vector and non-vector supercomputers based on their physical characteristics. Fujitsu Brief at 13; NEC Brief at 15–16. Specifically, NEC argues that processor type is viewed as a secondary characteristic of a supercomputer. Therefore, this distinction "is not significant" in terms of the function performed by a supercomputer—the processing of large arrays of data at very high speeds. NEC Brief at 12.

The record, however, does not support NEC's position. Rather, the evidence demonstrates that processor type imparts a clear physical characteristic that significantly affects programming. "A vector supercomputer is ... designed to process data in a specific way ...." Final Staff Report at I–2. "The vector hardware in a supercomputer allows processing of many data items as a group rather than individual items and of working on more than one instruction at the same time." *Id.* at I–11. "[P]rogramming is specially designed to minimize the time required to bring needed data from memory to processors and to the appropriate output device." *Id.*

NEC also argues that the "Commission relied on the mistaken belief that vector supercomputers process data in vector groups, while non-vector supercomputers process data in parallel." NEC Brief at 17. The ITC, however, does not dispute the fact that vector processors can and are linked together to process data in parallel. *See* Final Staff Report at I–11 ("The ability to process data using more than one processor (parallel processing), and thus decrease the time to solution, is a characteristic that has been incorporated in vector computers for at least a decade."). Rather, the Commission found that each of the individual vector processors process data in vector groups; thus, allowing the system to operate on more than one instruction at the same time. Views at 8–9.

Fujitsu also argues that the Commission failed to explain how a clear dividing line could be drawn between vector and non-vector systems in the mid-range segment of the market. Fujitsu Brief at 13. The Commission responds that this argument fails to recognize that a definition that includes all supercomputers would also encompass supercomputers such as lower-end servers and clustered work stations that are quite differentiated from vector supercomputers. Def. USITC Opp'n Mot. J. Agency R. ("Def.'s Brief") at 17. This position is borne out by the Final Staff Report. "[P]arallel computers with only one instruction unit and processors that work in lock-step are not good choices for most applications." Final Staff Report at I–18. Similarly, "[c]lustered workstations, at the low end of the distributed memory parallel processing systems, are not likely to perform well on very large simulations, especially if the problem is time sensitive." *Id.*

Fujitsu also argues that the Commission's finding that vector hardware alone "permits the system to operate on more than one instruction at a time" is not supported by the record. Fujitsu Brief at 19 (citing Views at 8–9). Fujitsu mischaracterizes the Commission's finding. The Commission did not find that vector hardware *alone* permits the system to operate on more than one instruction at a time. In fact, the Commission stated, "[vector hardware] also permits the system to operate on more than one instruction at the same time." Views at 8–9. While the Commission does not cite support for this position, the Final Staff Report includes a similar statement at I–11 ("The vector hardware in a supercomputer allows processing of many data items as a group rather than individual items and of working on more than one instruction at the same time.").

NEC also argues that the Commission incorrectly found that vector supercomputers have one large shared memory. NEC Brief at 18. NEC also, however, mischaracterizes the Commission's position. While the Commission noted "most vector supercomputers have one large shared memory," Views at 8, the Commission also recognized that "Fujitsu vector supercomputers do not have a shared memory, but do use vector processing." *Id.* n. 20.

Fujitsu does not challenge the Commission's findings regarding memory structure. Instead, Fujitsu argues that the Commission erred in ignoring the difference between Cray's and NEC's shared memory systems and Fujitsu's distributed memory structure.[2] Fujitsu Brief at 18. Specifically, Fujitsu maintains that because the Commission based its definition of the domestic like product in part on memory structure, the like product should have included all systems with a distributed memory structure "like" the memory structure of Fujitsu's vector systems, i.e., domestic non-vector systems. *Id.* at 19.

The Commission defined like product, however, based on the presence of a vector processor and not on any particular memory structure. Views at 8–9. In fact, the ITC explained that while Fujitsu vector supercomputers do not have a shared memory, they do use vector processing. *Id.* at 8 n. 20.

Plaintiffs also argue that the Commission's statement that vector supercomputers have processing units "that number only in the 10s" while the processing units in non-vector supercomputers "can number in the hundreds" is contradicted by the record evidence.[3] NEC Brief at 17–19; Fujitsu Brief at 16–17.

The Commission responds that the Plaintiffs' assertion is without merit because Plaintiffs refer to systems in which a number of vector supercomputer systems are linked together. Def.'s Brief at 22. The Commission maintains that each of these individual systems has processors which number only in the 10s. *Id.* at 23. The record supports this finding. *See* Aad J. van der Steen, *Overview of Recent Supercomputers,* Pub. Doc. No. 162, at 2.4 (stating that "the maximum number of processors in a vector system is still rather small (32 at most presently).").

The Court finds that based on the evidence cited above, the Commission reasonably determined that physical differences between vector supercomputers and non-vector supercomputers result in each type of system processing data differently.

## 2. Interchangeability of the Products

The Commission recognized, that "as a technical matter, virtually all codes that run on vector supercomputers can also be run on non-vector supercomputers." Views at 12. The Commission determined that in practice, however, certain codes run much more efficiently and quickly on vector supercomputers than on non-vector supercomputers. *Id.* The Commission found that significant practical limitations render vector supercomputers and non-vector supercomputers not easily interchangeable for a large number of applications. *Id.*

The Commission noted that two general categories of software are used in supercom-

---

**2.** Fujitsu also argues that the Commission's finding that vector processors unlike processors for non-vector systems, are "custom-made" for a single system is irrelevant. Fujitsu Brief at 16. Fujitsu maintains that, "[t]he mere existence of physical differences, without an explanation of how those differences affect performance or perception, is not a lawful basis for finding a bright line." *Id.* This court, however, has not read the "physical differences" factor of the Commission's like product analysis to require a performance and or perception finding. See *e.g., Timken Co. v. United States,* 20 CIT ——, ——, 913 F.Supp. 580, 585 (1996); *Cambridge Lee Indust., Inc. v. United States,* 13 CIT 1052, 1054, 728 F.Supp. 748, 750 (1989).

**3.** Fujitsu also challenges the Commission's conclusion that "the fact that end-users reported purchasing both vector and non-vector systems at the same time further suggests that the different systems provide distinct benefits." Fujitsu Brief at 22. Fujitsu maintains that this logic is flawed because customers purchase two or more vector systems at a time, but Cray never claimed that different types of vector systems constituted different like products. *Id.* at 23. This factor, however, was not a significant part of the Commission's determination. Moreover, it is within the evidence and to determine the overall significance of any particular factor or piece of evidence. *Maine Potato Council,* 9 CIT at 300, 613 F.Supp. at 1244.

puting: third-party applications and proprietary in-house applications. Views at 12. "For an application to be moved from a vector to a non-vector supercomputer, the software must be modified or rewritten altogether." *Id.* The Commission found that this generally involves a significant amount of time and effort on the part of the end user or a third party. *Id.* at 12–13. Further, the Commission determined that while efforts to port (i.e, move) third-party software from vector to non-vector platforms have been more successful than attempts to port proprietary software, it is unclear, however, whether third-party programs are running effectively, or have been optimized on the non-vector platforms to which they have been ported. *Id.* at 13.

Finally, the Commission noted that most users of proprietary, or "in-house" software indicated that their software applications (i.e., either vector or non-vector), were developed for a particular architecture, and that porting and optimizing large application codes to different architecture is very difficult. *Id.* at 13–14.

Fujitsu argues that the Commission relied on a vague word, "may," to unfairly convey the misimpression that evidence existed which applied to *most* vector supercomputers and non-vector supercomputers in *all segments* of the market. Fujitsu Brief at 25. Specifically, Fujitsu maintains that technical limitations do not prevent software applications from frequently operating on both vector and non-vector supercomputers in certain mid-range applications. *Id.*

The Commission specifically acknowledged this point: "that non-vector supercomputers can replicate vector supercomputers in some mid-range applications." Views at 11. The Commission recognized, however, that "practical significant limitations render vector supercomputers and non-vector supercomputers not easily interchangeable for a large number of applications." Views at 12.

NEC argues that the "minor limitations on interchangeability cited by the Commission fall short of substantial evidence in support of its finding of a vector supercomputer like product based on lack of interchangeability." [4] NEC Brief at 27. NEC is mistaken.

Whether differences among products are minor or significant is a factual issue for the ITC to decide, for which the question on review is whether its finding is supported by substantial evidence. *Torrington Co.*, 14 CIT at 651, 747 F.Supp. at 749. Here, there is substantial evidence on the record to support the Commission's conclusion that actual interchangeability between vector and non-vector architectures is limited.

With regard to proprietary applications, purchasers were asked whether their in-house software applications written for a vector supercomputer can be transferred easily and quickly to a non-vector supercomputer (and vice-versa), and what is the cost in terms of work-years that would be required to move major software applications from a vector to a non-vector system. Final Staff Report at II–17. Most purchasers reported that these applications can be transferred to run on another architecture; however, both transferring large applications and achieving optimal performance is generally very difficult. *See id.* n. 40.

---

4. NEC also argues that the Commission is bound by its past decisions that products "performing the same function and sharing the same *general* physical characteristics are part of the same like product, regardless of physical differences and limits on interchangeability." NEC Brief at 34 (emphasis in the original).

There is agency precedent, however, for not expanding the like product definition to include domestic interchangeable goods. *See e.g., Foam Extruded PVC and Polystyrene Framing Stock From the United Kingdom*, USITC Pub. No. 2930, Inv. No. 731-TA-738 (Preliminary), at 6 (Oct. 1995)(declining to include framing stock of wood, metal and other non-subject materials in the like product notwithstanding some degree of interchangeability); *Minivans From Japan*, USITC Pub. No. 2529, Inv. No. 731-TA-522 (Final), at 5 (July 1992)("There is some overlap between the different types of vehicles and therefore a degree of substitutability ... between certain minivans and certain station wagons, full-size vans, and sport-utility vehicles. The record as a whole, however, indicates that minivans as a product category fill a market niche that is only partially served by these other vehicles.")

Accordingly, the Commission's decision reflects its case-by-case approach rather than an established agency rule or precedent. See *Asociacion Colombiana*, 12 CIT at 638, 693 F.Supp. at 1169 n.5.

With respect to third-party applications, efforts to port this software from vector to non-vector platforms have been more successful. *Id.* at II–14. Nevertheless, "several major third-party applications do not run effectively on non-vector supercomputers." Views at 13 (citing Final Staff Report at II–15–II–16 nn. 32 & 33) (noting for example, that Cray cited two applications in the automotive industry, and one in the chemical market, as examples of widely used third-party applications that require large vector systems to run analysis reliably, in the required turnaround time, and with repeatable results)).

Fujitsu also argues that the Commission erred in disregarding the displacement of vector supercomputers by non-vector supercomputers and, instead relying on the lack of interchangeability in segments of the market which are still characterized by "intra-temporal" competition among only Japanese and Cray vector systems. Fujitsu Brief at 7. Fujitsu maintains that, this "effectively reads the interchangeability standard out of the law." *Id.* Fujitsu cites *High–Information Content Flat Panel Displays and Display Glass Therefor From Japan,* USITC Pub. No. 2610, Inv. No. 731–TA–469, (Views on Remand) (Final) (Mar.1993), to support its position. This case, however, does not support Fujitsu's argument.

In *Flat Panel Displays,* the Commission found overlaps in physical characteristics, end uses and other factors between the subject and non-subject high-information content flat panel displays ("FPD"). *See* I–12. Further, the record was replete with evidence demonstrating the extremely rapidly developing nature of FPD technology. The Commission explained, "[w]hat may have been a possible dividing line between different FPD technologies yesterday, therefore, may no longer exist today, and what may be a possible dividing line today may disappear tomorrow." The record indicates that "the specific end uses to which [FPD's] have been put at any point in time is largely dependent upon *currently available* technology." *Id.* at I–10 (emphasis provided). The Commission concluded that, while some differences existed, "those differences are relatively minor when

viewed in the context of the development of . . . FPD technology." *Id.* at I–9.

In contrast here, the Commission found clear physical differences and some overlap in end-use applications. Further, the record clearly demonstrates limited effective interchangeability: regardless of the present advances in technology, the porting and optimizing of large application codes from vector to non-vector supercomputers is very difficult. *See* Final Staff Report at II–17. For example, one purchaser reported that "it is very difficult to transfer these codes from one architecture to another and expect to get competitive performance." *Id.* n. 40. Another stated, "[y]es we develop applications in-house. Software written for a vector supercomputer cannot be transferred quickly and easily. The cost in terms of man years is equivalent to [the] cost of writing the code originally." *Id.* A third purchaser reported that, "[d]ue to our long history of vector supercomputing, most software applications were developed for vector supercomputers. However, in recent years the trend has been going to parallel systems. Usually the software cannot transfer easily from vector to parallel systems." *Id.*

Based on the evidence cited above, the Court finds the Commission's conclusion that significant practical limitations affect the interchangeability of vector and non-vector supercomputers in a large number of applications to be supported by substantial evidence.

**3. Producer and Customer Perceptions of the Product**

The Commission determined that supercomputers are purchased to run highly sophisticated programs and applications which are specifically designed for either vector or non-vector processing. Views at 16–17. Most purchasers stated that their in-house software applications were usually developed for a particular architecture. While many purchasers stated that the applications could be ported to another architecture, several noted that the process was difficult, time-consuming, expensive and often not effective/successful. Final Staff Report at II–17–II–20. Based on this evidence the Commission found that customers perceive vector

and non-vector supercomputers to be distinct products. Views at 16.

The Commission also found that producers perceive a difference between vector and non-vector supercomputers. *Id.* Several producers of non-vector supercomputers including Cray, acknowledged that some procurements favored vector processing. Views at 18 n. 51 (citing Commission Questionnaire responses of two large domestic manufacturers of computers). Further, the ITC found the fact that producers perceived the products to be different is evidenced by the fact that both Fujitsu and NEC have added or are in the process of adding non-vector supercomputers to compliment their product line. *Id.* at 18. Finally, the Commission noted that Cray, the only domestic producer of vector supercomputers, considers its vector and non-vector operations to be separate lines of businesses. *Id.* The Commission concluded that consumers and producers perceive vector and non-vector supercomputers to be distinct products. *Id.*

NEC argues that the Commission "ignored overwhelming evidence on the record that purchasers perceive vector and non-vector supercomputers as a single like product." NEC Brief at 28. Specifically, NEC maintains that the Commission's conclusion that many users find the process of conversion to be "generally very difficult, time consuming and expensive," was based on the same fragments invoked to support its finding of limited interchangeability; the anecdotal observations of three representatives of government agencies that have used domestically manufactured vector supercomputers for a long time. *Id.* at 29.

First, "absent some showing to the contrary, the Commission is presumed to have considered all of the evidence in the record." *National Ass'n of Mirror Mfrs. v. United States,* 12 CIT 771, 779, 696 F.Supp. 642, 648 (1988).

Second, the Commission responds that NEC's point relates primarily to the issue of interchangeability of the different architectures. Def.'s Brief at 31. As noted, the ITC recognized that vector and non-vector supercomputers may be perceived to be interchangeable for some mid-range applications.

*See supra* text at 16. Nevertheless, the Commission found that they are also perceived to be different products. Views at 18 n. 54. The record supports the Commission's position.

For example, one of the three major auto makers reported that parallel processing has not proven to be an effective method to replace vector supercomputers for some of it's applications. *See* Final Staff Report at II–15 n. 32 (reporting that "NASTRAN is pretty much done on vector machines. Some NASTRAN jobs are run on parallel machines, but they do not get the same performance results. Parallel machines need 5 days to complete a large crash analysis, whereas the vector machines can complete the crash analysis in 3 days. To [this company], the difference between 5 and 3 days is significant."). Other evidence reinforces the views expressed by this auto maker. Specifically, the Commission asked purchasers if other products or services could substitute for the purchase or lease of vector supercomputers. *See e.g.,* Conf. Doc. No. 93, Part II, Sect. I, at 5 (Final Purchaser Questionnaire, Western Atlas International Inc.) (July 11, 1997). More than twenty-five purchasers answered the question. Most stated that there were no substitutes, or alternatively, the degree of substitutability was limited. Conf. Doc. No. 29 (Cray Post–Hearing Brief and Answers to Commission Questions, Ex. 1–A, at 1–2).

NEC also argues that one major domestic computer manufacturer reported that of the nearly 1,000 supercomputer procurements in which it has been involved, only three favored vector processing. NEC Brief at 32. NEC mischaracterizes the manufacturer's response. The domestic manufacturer stated that there were three sales in which it did not bid because specifications favored vector processing. *See* Conf. Doc. No. 95, Question IV.A.7, at 17 (Final Producers Questionnaire, Response of Domestic Computer Producer) (June 12, 1997). This was in response to the question: "[f]rom January 1, 1994 to the present have there been instances when your firm was aware of a request for [a] bid for a vector or non-vector supercomputer system, but your firm did not bid on this sale?" *Id.*

The response, however, makes no reference to the other procurements that the manufacturer did bid on.

Fujitsu also argues that the fact that many software applications have in the past been developed for use on a particular type of architecture does not establish a lack of substitutability between vector and non-vector supercomputers. Fujitsu Brief at 32. NEC further contends that relying on the historical differentiation by producers is ill-founded: "by this logic, Dodge and Plymouth automobiles, both marketed by Chrysler Corporation, must be considered separate like products—an absurd result." NEC Brief at 33.

However, "[i]t is within the Commission's discretion to make reasonable interpretations of the evidence . . . ."). *See National Ass'n of Mirror Mfrs.*, 12 CIT at 774, 696 F.Supp. at 644. Here, the evidence demonstrates that most purchasers develop in-house applications for a specific architecture. *See* Final Staff Report at II–17. In addition, most purchasers reported that the porting and optimizing of large application codes is generally very difficult. *Id.* Further, producers reported that some procurements favored vector processing. *Id.* Based on the record, the Commission reasonably inferred that purchasers and producers perceived significant differences between vector and non-vector supercomputers.

### 4. Price Differences

The Commission found that "[a]t the high end, vector supercomputers remain very expensive, generally ranging in price from $2.5 million to $40 million or more. At the low end vector system prices range from $300,-000 to $1 million." Views at 18. The ITC recognized that "[s]callable parallel systems range in price from $100,000 at the low end to hundreds of millions of dollars at the high end, thereby suggesting that certain non-vector systems are more expensive than vector systems." *Id.* The Commission concluded, however, that, "in general, non-vector systems are a less expensive option than vector machines, which supports a finding of

some price distinctions between the two groups of products." Views at 19.

Fujitsu does not challenge the Commission's factual finding. Rather, Fujitsu argues that the Commission based its conclusion on a fundamental misconception of how customers decide what system to purchase. Fujitsu Brief at 34. Fujitsu maintains that, "[p]urchase decisions are made on a total cost basis. In other words, in evaluating the cost of a system, prospective customers take into account not only the price of the supercomputer hardware, but also the cost of porting existing software applications, maintenance costs, and operation costs." *Id.* at 34–35. This point, however, does not detract from the evidence supporting the Commission's finding of price differences between vector and non-vector systems. *See* Final Staff Report at I–22.

Furthermore, most purchasers stated that vector systems were more expensive. For example, one purchaser stated that if one can get an application to run on a non-vector parallel computer efficiently, the cost of the non-vector parallel solution is probably less than a vector solution. *See* Conf. Doc. No. 29 (Cray Post–Hearing Brief and Answers to Commission Questions, Ex. 1–A, Question 5, at 1, Purchaser 1). Another purchaser noted that for a given (high) level of Gflops[5] performance, massively parallel processors and more recently symmetric multiprocessors are much cheaper then vector supercomputers. *Id.*, Purchaser 4. A third purchaser commented that vector supercomputers are generally more expensive than non-vector supercomputers. *Id.* at 2, Purchaser 10. Therefore, the Court finds the Commission's finding with respect to price differences was supported by substantial evidence.

Accordingly, the Court concludes that the Commission's determination that the domestic like product consists of only vector supercomputers is supported by substantial evidence.

---

**5.** Performance measured in gigaflops is determined by billions of floating point operations per

second. Final Staff Report at vi.

## II. Injury Determination

■ According to the Court of Appeals for the Federal Circuit, "[a]n affirmative injury determination requires both (1) present material injury and (2) a finding that the material injury is 'by reason of' the subject imports." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 719 (Fed.Cir.1997). The section of the antidumping statute that discusses the threat factors also includes the "by reason of" language. 19 U.S.C. § 1677(7)(F)(i). Thus, a positive threat determination also requires a showing of a causal connection between the LTFV goods and the threatened material injury. *Gerald Metals*, 132 F.3d at 720.

■ Further, the "by reason of" standard "mandates a causal—not merely temporal—connection between the LTFV goods and the [threat of] material injury." *Id.* "[A] showing that economic harm to the domestic industry [is likely to occur] when LTFV imports are also on the market is not enough to show that the imports [will likely] *cause* [ ] a material injury." *Id.* at 719. Nor does the mere showing of the existence of some likely economic harm rise to the standard of "material injury"—"harm which is not inconsequential, immaterial, or unimportant"—as required by the statute. *See* 19 U.S.C. § 1677(7)(A).

■ As it deals with the projection of future events, a threat of material injury analysis is inherently less amenable to quantification than the material injury analysis. *See Hannibal Indus., Inc. v. United States*, 13 CIT 202, 209, 710 F.Supp. 332, 338 (1989); *Rhone Poulenc, S.A. v. United States*, 8 CIT 47, 59, 592 F.Supp. 1318, 1329 (1984). Nevertheless, the statute requires adequate evidence to show that the harm will occur by reason of the LTFV imports, not by reason of a minimal or tangential contribution to material harm caused by LTFV goods. *Gerald Metals*, 132 F.3d at 722.

In examining the causal connection between the LTFV imports and the threatened material injury, the Commission is required by statute to consider, "among other relevant economic factors," the following nine factors:

(I) if a countervailable subsidy is involved, such information as may be presented to it by the administering authority as to the nature of the subsidy . . . .

(II) any existing unused production capacity or imminent, substantial increase in production capacity in the exporting country indicating the likelihood of substantially increased imports of the subject merchandise into the United States, taking into account the availability of other export markets to absorb any additional exports,

(III) a significant rate of increase of the volume or market penetration of imports of the subject merchandise indicating the likelihood of substantially increased imports,

(IV) whether imports of the subject merchandise are entering at prices that are likely to have a significant depressing or suppressing effect on domestic prices, and are likely to increase demand for further imports,

(V) inventories of the subject merchandise,

(VI) the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products,

(VII) in any investigation under this subtitle which involves imports of both a raw agricultural product . . . and any product processed from such raw agricultural product . . . ,

(VIII) the actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and

(IX) any other demonstrable adverse trends that indicate the probability that there is likely to be material injury by reason of imports (or sale for importation) of the subject merchandise (whether or not it is actually being imported at the time).

19 U.S.C. § 1677(7)(F)(i)(1994).

The Commission evaluates these factors in considering the causal effects of the LTFV imports on the threatened harm to the domestic industry by applying the standards

set forth in section 1677(F)(ii). *See* 19 U.S.C. § 1677(F)(ii). The Commission is to "consider the factors set forth [above] as a whole in making a determination of whether further dumped ... imports are imminent and whether material injury by reason of imports would occur unless an order is issued ...." *Id.*

■■■ Thus, after considering all relevant economic factors in making a determination of whether further dumped imports are imminent, the Commission must make an analytically distinct determination to comply with the "by reason of" standard. *See Gerald Metals Inc. v. United States*, 27 F.Supp.2d 1351 (1998). To make this showing, the Commission must determine whether the LTFV imports themselves made a material contribution to the threatened material injury. *Id.* Therefore, proper adherence to the causation analysis incorporated in the statute prevents the Commission from finding threatened material injury by reason of LTFV imports where their contribution to overall harm is *de minimis* (i.e., minimal or tangential).

■■■ Our first question, then, is whether the Commission considered its threat of material injury finding in a manner consistent with this legal standard.

The Commission found that the domestic industry producing vector supercomputers was threatened with material injury by reason of the LTFV imports from Japan. Views at 38. The Commission based its finding in part on its vulnerability analysis, explaining that the "industry's current weakened financial condition due to restructuring expenses, the shift in demand from large scale to lower-margin mid-range systems, declining government sales, and overall declining profitability makes [the domestic industry] particularly vulnerable" to the adverse effects of dumped imports. *Id.* at 46.

Here, the record indicates that there were significant economic factors having a negative impact on the domestic industry that are entirely unrelated to the subject imports. *Id.* at 21–24. The Commission, however, did not undertake any analysis to distinguish between the contribution to material harm caused by LTFV goods and these economic factors unrelated to the subject imports.[6] Rather, the Commission stated that, "[a]lthough [it] may consider causes of injury to the industry other than the LTFV imports, it is not to weigh causes." *Id.* at 30. Consequently, it appears that the Commission may have adopted the reasoning that any contribution to material harm caused by LTFV imports constitutes sufficient causation to satisfy the "by reason of" test.[7] This approach, however, is contradictory to the "by reason of" standard articulated by the Federal Circuit. *Gerald Metals*, 132 F.3d at 722.

The Court notes that the Senate Report to the Trade Agreements Act of 1979 states that the "law does not contemplate that the effects from [LTFV] imports be weighed against the effects associated with other factors[.]" S.Rep. No. 249, 96th Cong., 1st Sess. at 74 (1979). The Federal Circuit, however, declined to endorse the 1979 Senate Report in *Gerald Metals*. *See* 132 F.3d at 722; *see also Gerald Metals*, at 1356 n. 8; Statement of Administrative Action, H.R. Doc. No. 316, 103d Cong., 2d Sess. (1994), reprinted in Uruguay Round Agreements Act, Legislative History, Vol. VI, at 852 ("SAA") ("[T]he Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports.").[8]

---

6. The Court notes that the antidumping statute on its face does not compel a single method for analyzing causation, so long as the requirements of § 1677(7)(F) are met. *See Gerald Metals*, 27 F.Supp.2d at 1356.

7. "To the contrary, the statute requires the injury to occur 'by reason of' the LTFV imports. This language does not suggest that an importer of LTFV goods can escape ... duties by finding some tangential or minor cause unrelated to the LFTV goods that [is likely to contribute] to the harmful effects on [the domestic market]. By the same token, this language does not suggest that the Government satisfies its burden of proof by showing that the LTFV goods themselves [will contribute] only minimally or tangentially to the material harm." *Gerald Metals*, 132 F.3d at 722.

8. The Statement of Administrative Action represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements ...." SAA at 656. "[I]t is

On this record, the Court cannot conclude that the Commission made the requisite determination that the LTFV imports themselves made a material contribution to the threat of material injury.

In addition, the Commission's consideration of one of the statutory threat factors suggests that it did not apply the analysis mandated by the Federal Circuit.[9]

In considering the price effects of future imports, the Commission received information on competing domestic and subject import bids where the domestic and imported product were in direct competition on five projects worth almost $89 million. Views at 43. One of these transactions—the possible sale by NEC to the University Corporation for Atmospheric Research ("UCAR") for use by the National Center for Atmospheric Research ("NCAR")—was postponed in response to Commerce's final antidumping determination.[10] Regarding the remaining transactions, the Commission found, "[i]n three ... instances, the imported product significantly underbid the domestic product. Although the foreign producer was often *not successful* with the low bid, this aggressive behavior is an indication of the willingness of the Japanese producers to price aggressively to try to take sales from the domestic industry." *Id.* (emphasis provided). The Commission concluded that the increased subject imports will enter at prices likely to depress or suppress prices to a *significant* degree. *Id.* (emphasis provided).

Plaintiffs challenge the Commission's finding, arguing that there can be no price sup-

pressing or effects due to imports because contractFujitsu Brief at 39; NEC Brief at 42.s are awarded on a basis other than prices.

The Commission recognized this point, however, noting that "although purchasing decisions are made on the basis of a variety of factors, price clearly is one of these, and the underbidding by Japanese producers ... indicates that the imports will likely have a significant price depressing or suppressing effect on domestic prices." Views at 45. In support of this statement, the Commission cites to three of the five projects reviewed. In a bid to one large pharmaceutical company, Fujitsu's bid was almost sixty-five percent lower than the domestic bid, based on $million/Gflop. *Id.* (citing Final Staff Report at V-26). Although the UCAR project was cancelled, the Federal Computer Corporation was the only company still under consideration, with a final bid that was approximately forty percent below Cray's final bid. *Id.* at 44. The Court does not find this analysis, by itself, convincing.

First, the Commission itself concluded that the LTFV imports did not significantly affect prices during the period of investigation. Views at 33. Second, this case is unlike the situation in *Goss Graphics System, Inc. v. United States*, where the record clearly demonstrated that price was an important factor in the purchaser's decision. *See* 22 CIT —, —, 33 F.Supp.2d 1082, (1998) (noting that eighteen of the fifty purchasers surveyed said that price was among the top three most significant factors in choosing which vendor to use, that forty-four of forty-eight purchas-

---

the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement." *Id.*(quoted in *Delverde, SrL v. United States*, 21 CIT —, —, 989 F.Supp. 218, 229-30 n.18 (1997)).

9. The Court here is not endorsing a "magic words analysis." It is a well recognized principle of administrative law, that "[a] court may'uphold [an agency's] decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Ceramica Regiomontana, S.A. v. United States*, 5 Fed. Cir. (T) 77, 78, 810 F.2d 1137, 1138 (1987)(quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)); *see Colorado Interstate Gas Co. v. FPC*, 324 U.S. 581, 595,

65 S.Ct. 829, 89 L.Ed. 1206 (1945). Rather, the Court is nothing that neither the Commission's finding overall, nor its analysis of the individual statutory threat factors, indicate that it applied the analysis mandated by the Federal Circuit. *See e.g., Goss Graphics System, Inc. v. United States*, 22 CIT —, —, 33 F.Supp.2d 1082 (1998)(upholding ITC's affirmative threat of injury determination after review of Commission's assessment of the individual economic threat factors).

10. The UCAR contract was placed on hold until the completion of this investigation. In the interim, NCAR extended its existing leases which did not involve using foreign imports. *See* Final Staff Report at VII-6, n.23.

ers considered price to be either critical, very important or moderately important, and that in almost half of the bids involving competition between domestic and subject merchandise, the bid was awarded to the lowest bidder).

Third, more than seventy-five percent of the reported value of vector supercomputer purchases during January 1994 to June 1997 were single-sourced.[11] Fourth, three of the five projects cited by the Commission to support its price analysis were won by the domestic industry. Views at 44. In addition, the majority of the projects reviewed were won by suppliers with bids that were significantly higher-priced. Final Staff Report at V-27.

On this record, the Court cannot conclude that the Commission applied the correct legal standard in evaluating the cited examples of aggressive pricing in order to find that LTFV imports themselves "are likely to have a significant depressing or suppressing effect on domestic prices." 19 U.S.C. § 1677(F)(i)(IV). Furthermore, the Commission has failed to explain how bids involving imports would affect future prices when prices has not been previously determinative.

Accordingly, the Court cannot conclude that the Commission made the requisite determination that the LTFV imports themselves made a material contribution to the threatened material injury. Therefore, the Court remands the Commission's threat determination for further explanation or reconsideration.

### Conclusion

The Commission shall reconsider its determination in a manner consistent with this opinion. The Commission shall file its remand determination with the Court within 90 days. Plaintiffs and Defendant-Intervenors are granted 30 days to file comments on the remand determination. The Commission may respond to any comments filed within 20 days.

---

**11.** Final Staff Report at V-4 n.2. Purchasers sole source through either a direct, non-competitive procurement, or by a specification which defines a specific product. Id. at II-22 n.46.