Slip Op. 12-129

# UNITED STATES COURT OF INTERNATIONAL TRADE

ALUMINUM EXTRUSIONS FAIR TRADE
COMMITTEE,

       Plaintiff,

       v.

UNITED STATES,

       Defendant,

       and

AAVID THERMALLOY, LLC,

       Defendant-Intervenor.

Before: Judith M. Barzilay, Senior Judge

Court No. 11-00205
Public Version

## **OPINION**

[Final determination affirmed.]

October 11, 2012

*Brian E. McGill, King & Spalding LLP,* Washington, DC, argued for Plaintiff, The Aluminum Extrusions Fair Trade Committee. With him on the brief was *Stephen A. Jones*.

*Peter L. Sultan*, Attorney, Office of General Counsel, U.S. International Trade Commission, Washington, DC, argued for Defendant. With him on the brief were *James M. Lyons*, General Counsel; *Andrea C. Casson*, Assistant General Counsel for Litigation; and *Geoffrey S. Carlson*, Attorney.

*Sydney H. Mintzer*, *Mayer Brown LLP*, Washington, DC, argued for Defendant-Intervenor, Aavid Thermalloy, LLC. With him on the brief was *Duane W. Layton*.

      BARZILAY, Senior Judge:  Before the court is Plaintiff Aluminum Extrusions Fair

Trade Committee's ("Plaintiff") motion for judgment on the agency record pursuant to USCIT

Rule 56.2.  Plaintiff challenges the International Trade Commission's ("ITC" or "Commission")

final determination that the domestic finished heat sink industry was neither materially injured nor threatened with material injury by reason of imports of finished heat sinks from the People's Republic of China. *Certain Aluminum Extrusions from China*, USITC Pub. 4229, Inv. Nos. 701-TA-475 and 731-TA-1177 (May 2011) (final determination). The court has jurisdiction pursuant to 28 U.S.C. § 1581(c). For the reasons below, the court affirms the Commission's determination.

## I. BACKGROUND

On March 31, 2010, the Commission initiated an investigation into whether a domestic industry was materially injured or threatened with material injury by reason of imports of certain aluminum extrusions. *Certain Aluminum Extrusions from China*, 75 Fed. Reg. 17,436 (ITC Apr. 6, 2010) (initiation of investigations). In its preliminary determination, the ITC found that "the current record does not indicate any clear dividing line between categories of in-scope products . . . ." P.R. 77 at 9. Accordingly, the Commission found that aluminum extrusions constitute an indivisible continuum of like products. P.R. 77 at 10.

In November 2010, Defendant-Intervenor Aavid Thermalloy, LLC ("Defendant-Intervenor" or "Aavid") filed a notice of entry, P.R. 106, and requested that the ITC seek disaggregated data for heat sinks, a type of aluminum extrusion, C.R. 147. Aavid argued that heat sinks, aluminum extrusions designed and tested to cool electronic devices, comprise a separate like product. C.R. 147. The Commission circulated for comment draft questionnaires requesting data on three varieties of aluminum extrusion: heat sink blanks, fabricated heat sinks, and finished heat sinks. P.R. 119 at 6-7. The Commission defined fabricated heat sinks as "any heat sink blank that has been cut-to-length, precision machined, and or otherwise fabricated to the end product specifications, but not yet tested, assembled into other materials, or packaged."

P.R. 119 at 6. By contrast, the agency defined finished heat sinks as "the final product ready to be sold to electronic manufacturers. Finished heat sinks differ from fabricated heat sinks in that they have been fully test [sic] and assured to comply with the required end-use specifications." P.R. 119 at 6-7. The Commission requested production and import data on aluminum extrusions as distinct from finished heat sinks and asked for a comparison between the two. C.R. 262.

The Commission issued its final views on May 19, 2011. *Certain Aluminum Extrusions from China*, 76 Fed. Reg. 29,007 (ITC May 19, 2011). This notice clarified the ITC's definition of finished heat sinks: "[F]abricated heat sinks, sold to electronics manufacturers, the design and production of which are organized around meeting certain specified thermal performance requirements and which have been fully, albeit not necessarily individually, tested to comply with such requirements." C.R. 496 at 32. Relying on this definition, the Commission found that finished heat sinks and aluminum extrusions constitute separate like products for the purpose of its material injury determination. C.R. 496 at 9. The Commission based its conclusion on

> the customized thermal resistance properties of [finished heat sinks]; the unique aspects of the design, testing and production of [finished heat sinks]; differences between [finished heat sinks] and other aluminum extrusions in the channels of trade through which they are sold; evidence that the thermal management industry is perceived by producers and customers as being different from the general aluminum extrusions industry; and the fact that [finished heat sinks] are sold at much higher prices because of high value-added than most other aluminum extrusions.

C.R. 496 at 9.

The Commission found that four producers comprised the domestic finished heat sink industry: Aavid, Alexandria Extrusion, Light Metals, and Wakefield Solutions. C.R. 485 at I-15 n.19; C.R. 496 at 17. Turning to its injury analysis, the Commission found that the increase in quantity and market share of imported finished heat sinks was not significant. C.R. 496 at 33. Next, the Commission found, based on quarterly pricing data from [[      ]] Product 7, the only

finished heat sink product for which it received pricing data, that subject imports were not underselling domestic products. C.R. 496 at 35. The Commission also determined that "there was no correlation between trends in the subject imports and the industry's condition." C.R. 496 at 37. Lastly, the Commission found that "the market share of subject imports will not imminently increase substantially above that during the period examined and that such imports will not likely have significant adverse price effects . . . . [and therefore] that the domestic industry . . . is not threatened with material injury by reason of imports of finished heat sinks from China." C.R. 496 at 40. The Commission issued a negative injury determination for finished heat sinks and this action ensued.

## II. STANDARD OF REVIEW

This court must uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (citation and quotation marks omitted). That plaintiff can point to evidence that detracts from the agency's conclusion or that there is a "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted). Although the court reviews anything in the record that "fairly detracts from the substantiality of the evidence," *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1335 (Fed. Cir. 2002) (citation and quotation marks omitted), "[t]he ITC is not required to explicitly address every piece of evidence presented by the parties, and absent a showing to the contrary, the ITC is presumed to have considered all of the evidence on the record," *USEC Inc. v. United States*, 34 F. App'x 725,

731 (Fed. Cir. 2002). "In sum, the Court 'may not reweigh the evidence or substitute its own judgment for that of the agency.'" *Cleo Inc. v. United States*, 30 CIT 1380, 1382 (2006) (citation omitted) (not reported in F. Supp.).

## III. DISCUSSION

### A. The Commission's Like-Product Determination

Before proceeding to its material injury analysis, the Commission must define the applicable domestic like product (i.e., "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation"). 19 U.S.C. § 1677(10). In so doing, it generally considers six factors: "(1) physical characteristics and uses; (2) common manufacturing facilities and production employees; (3) interchangeability; (4) customer perceptions; (5) channels of distribution; and (6) price." *Cleo Inc. v. United States*, 501 F.3d 1291, 1295 (Fed. Cir. 2007). "The Commission generally disregards minor differences, and looks for clear dividing lines between like products." *Nippon Steel Co. v. United States*, 19 CIT 450, 455 (1995) (not reported in F. Supp.). Determining whether differences among products are minor or significant is a factual determination for the Commission to undertake on a case-by-case basis. *Cleo Inc.*, 30 CIT at 1383. The Court must, therefore, defer to the Commission's weighing of the six factors provided its determination is reasonable. *See Maine Potato Council v. United States*, 9 CIT 293, 300, 613 F. Supp. 1237, 1244 (1985). Notably, "[t]he finding of some similarities among the products delineated by the Commission is not sufficient to overturn the determination[] when there is otherwise substantial evidence to support its finding." *Chefline Corp. v. United States*, 25 CIT 1129, 1134, 170 F. Supp. 2d 1320, 1328 (2001) (alteration in original) (quoting *Torrington Co. v. United States*, 14 CIT 648, 656, 747 F. Supp. 744, 753 (1990)).

The court must initially address two arguments that frame much of the instant dispute. First, Plaintiff argues that the Commission departed from prior practice by carving out from a continuum (all aluminum extrusions) a separate like product (finished heat sinks). Pl.'s Br. 13-15. Where the Commission has found that no clear dividing lines exist within a continuum of products, the agency will indeed treat that continuum as a single like product rather than arbitrarily subdividing it. *See Chefline Corp.*, 25 CIT at 1136, 170 F. Supp. 2d at 1329. For the court to find that the Commission departed from this prior practice, therefore, the agency must first have found the product at issue constitutes a continuum.[1] *See id.* at 1330 ("Chefline's claim of departure from prior practice would perhaps have merit if it were the case that the Commission found a 'continuum' of domestic products, then 'artificially divided' it by ignoring 'minor differences' or 'competitive realities.'"). This was not the case here. Instead, the Commission relied on the six aforementioned factors to conclude that there was a clear dividing line between two separate products: finished heat sinks and aluminum extrusions. C.R. 496 at 9. Plaintiff has identified no applicable prior practice from which the Commission departed in this case and the court cannot remand on that basis.

Second, Plaintiff contends that the Commission erred by finding a clear dividing line after comparing finished heat sinks and all other aluminum extrusions. Pl.'s Br. 14-15, 18, 20, 21. The proper comparison, Plaintiff avers, was between finished heat sinks and their most comparable type of aluminum extrusion, fabricated heat sinks, which are, according to Plaintiff, identical to finished heat sinks apart from the thermal testing requirement. Pl.'s Br. 14-15, 18, 20, 21. Defendant, in turn, argues that "the appropriate comparison [for finished heat sinks] is

---

[1] The Commission did find aluminum extrusions to be a continuum in the preliminary determination, P.R. 77 at 9-10, but amended this finding in its final determination after engaging in the requisite six-factor analysis, C.R. 496 at 5-9.

with those other aluminum extrusions as a whole, not just other heat sinks . . . ." Def.'s Br. 13. In a limited sense, Plaintiff is correct that the commonalities between finished and fabricated heat sinks are relevant. The Commission's like-product determination – which necessarily includes the thermal testing distinction between in-scope and out-of-scope heat sinks – is indeed before the court for review. The question is not, however, which products the ITC should have compared finished heat sinks to, but whether the Commission's finding of a clear dividing line between finished heat sinks and all other aluminum extrusions is supported by substantial evidence in the record. It is to this analysis that the court now turns.

### 1. Physical Characteristics and Uses

All aluminum extrusions are made from the same series of aluminum alloys. C.R. 496 at 6. The Commission found, however, that the flat surface level for finished heat sinks "is often 1/1000 of an inch per inch, compared to 4/1000 to 14/1000 of an inch per inch for ordinary aluminum extrusions." C.R. 496 at 6. "The precise flatness of [finished heat sinks] allows for close contact between the [finished heat sink] and the heat-generating components for which they have been designed and to which they are attached . . . ." C.R. 496 at 6. In addition, the ITC found that finished heat sinks "are also characterized by their thermal resistance properties" and their certification "to perform within thermal resistance parameters." C.R. 496 at 7. Acknowledging that these thermal resistance properties are not visible, the Commission noted that they are nevertheless relevant to customers' needs. C.R. 496 at 7.

Plaintiff first argues that the Commission failed to quantify the proportion of finished heat sinks that have the distinctive 1/1000 of an inch per inch flat surface tolerance, merely stating that they "often" bear such tolerances. Pl.'s Br. 17. Plaintiff also contends that the Commission discounted evidence that other aluminum extrusions similarly have a flat surface

tolerance of 1/1000 of an inch per inch. Pl.'s Br. 18. An agency's explanation of its determination need not be perfect, provided it is "reasonably discernible to a reviewing court." *NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) (citation omitted). In addition, as noted, overlap of physical characteristics is not by itself sufficient to render a determination unsupported. *See Chefline Corp.*, 25 CIT at 1134, 170 F. Supp. 2d at 1328. In this case, the Commission was presented with evidence that finished heat sinks must be of precise dimensions and that they generally have a particular flat surface tolerance that is crucial to performing the intended task of cooling electronic equipment. C.R. 436 at 8, Attach. A at 6. The Commission acknowledged that this flat surface tolerance was not unique to finished heat sinks, but noted that, "from the thousands of different types of aluminum extrusions, [Plaintiff] cite[d] only two examples (framing for solar mirror assemblies and locking systems for cockpit doors)" that have a comparable tolerance.[2] C.R. 496 at 6 n.21. This rather scant evidence of overlap is not sufficient to detract from the Commission's reliance on record evidence, nor is the Commission's use of the inexact term "often."[3] Though Plaintiff would have the court weigh the evidence differently, sufficient record evidence exists to support the finding that finished heat sinks are distinguishable based on their flat surface tolerance.

Plaintiff also argues that the thermal testing component of finished heat sinks does not serve to differentiate the products based on their physical characteristics. Pl.'s Br. 18.

---

[2] Plaintiff avers that it also identified [[
                                        ]] Pl.'s Br. 18.

[3] In regards of comparable flat surface tolerances in other aluminum extrusions, Plaintiff avers that "[e]ven one example is enough to establish that [finished heat sinks] are not unique in respect to close fabrication tolerances." Pl.'s Br. 18. As discussed *infra*, however, a like-product determination is not invalidated merely because there is some overlapping characteristic between different products. *See Chefline Corp.*, 25 CIT at 1134, 170 F. Supp. 2d at 1329.

Specifically, Plaintiff cites previous determinations in which the Commission declined to use a

testing requirement to differentiate a separate like product. Pl.'s Br. 18. Plaintiff's argument

lacks merit. "The Commission's decision regarding the appropriate domestic like product is a

factual determination, where the Commission applies the statutory standard of 'like' or 'most

similar in characteristics and uses' on a case-by-case basis." *NEC Corp. v. Dep't of Commerce*,

22 CIT 1108, 1110, 36 F. Supp. 2d 380, 383 (1998). In the case at bar, the Commission

reasonably found that the thermal testing requirement distinguished finished heat sinks in regards

to their end use, as well as other factors discussed below. Notably, the Commission has

previously taken into account testing requirements when making its like-product finding. *See,

e.g.*, *Automotive Replacement Glass Windshields from China*, USITC Pub. No. 3494, 2002 WL

560896 at *22, Inv. No. 731-TA-922 (Final) (Mar. 2002); *Certain Brake Drums and Rotors from

China*, USITC Pub. No. 3035, 1997 WL 416149, Inv. No. 731-TA-744 (Final) (Apr. 1997).

There is no basis, therefore, from which the court could conclude that the Commission exceeded

the broad scope of its discretion in this matter.

Plaintiff also highlights that each of the wide variety of aluminum extrusion products, not

merely finished heat sinks, has a distinct end use. Pl.'s Br. 17. As noted, the court's review is

limited to whether the ITC's dividing line drawn between finished heat sinks and all other

aluminum extrusions is reasonable on this administrative record. Here, the record contains

evidence that finished heat sinks – tested and certified for heat resistance – have a distinct use

customers require for thermal management in electronic devices. P.R. 236 at 166-67. The

Commission exercised its discretion to interpret this evidence as indicative that finished heat

sinks should be viewed as a separate like product. Though "many other aluminum extrusions

also have distinct individual-use applications," C.R. 496 at 7, the scope of the "all other

aluminum extrusions" like-product category is not before the court. Finished heat sinks' distinct physical characteristics and end use support the Commission's like-product determination at issue in this action.

### 2. Interchangeability

Plaintiff next notes that all manner of aluminum extrusions are not interchangeable and that the lack of interchangeability between finished heat sinks and all other aluminum extrusions cannot support the like-product determination. Pl.'s Br. 19. As Plaintiff admits, the Commission did not rely on the interchangeability factor in its like-product determination. C.R. 496 at 7, 9. The ITC need not ascribe any weight to this factor and the court has no basis upon which to question that decision. *See Maine Potato Council*, 9 CIT at 300, 613 F. Supp. at 1244.

### 3. Channels of Distribution

Plaintiff challenges the Commission's finding that finished heat sinks and aluminum extrusions are sold in distinct channels of distribution. Pl.'s Br. 20. Plaintiff argues, in particular, that the Commission failed to explain how the applicable end users and distributors – electronics manufacturers and distributors of electronics components respectively, C.R. 496 at 7-8 – distinguish finished heat sinks from heat sinks that are not thermally tested and remain in the aluminum extrusions like-product category (i.e., fabricated heat sinks). Pl.'s Br. 20.

In the final determination, the Commission relied upon evidence that "[a]luminum extrusion distributors do not sell [finished heat sinks] and [finished heat sink] distributors do not sell aluminum extrusions." C.R. 436 at 14-16; C.R. 496 at 8. In particular, the Commission relied on evidence submitted by Aavid that Eastern Metal Supply, Aluminum Shapes, Inc., My Aluminum Supply, and Aluminum Distributing Inc., all sellers of general aluminum extrusions, do not sell finished heat sinks. C.R. 436 at 15. Plaintiff fails to provide any evidence or

rationale detracting from this record evidence. The Commission's reliance on this factor to distinguish finished heat sinks is reasonable and therefore supported by substantial evidence.

### 4. Common Manufacturing Facilities and Production Processes and Employees

Plaintiff next challenges the Commission's finding that finished heat sinks are distinguishable based on their manufacturing process and production equipment. Pl.'s Br. 20-22. Plaintiff argues that "[t]here is no difference between [finished heat sinks] and other heat sinks for electronics applications that are not post-production tested based on these design services." Pl.'s Br. 21. Plaintiff relies on views from the dissenting ITC commissioners, noting that all heat sinks are subject to the same heat sink blank production and subsequent finishing. Pl.'s Br. 21.

All types of aluminum extrusions share the same basic production process: Aluminum billets are heated until soft and "then pushed or squeezed into a precision opening, or die, to produce the desired shape." C.R. 496 at 8. The Commission found that finished heat sinks are specifically "held in and fabricated by a computer controlled milling machine to add holes, clearance pockets, and attachment points for heat generating devices." C.R. 496 at 8. Of note, the final determination explains the relevance of thermal resistance testing to differentiating finished heat sinks:

> Specialized equipment, including wind tunnels, flow calibration equipment, testing equipment, and specialized design and data collection software, are used to design [finished heat sinks] and to produce prototypes. Highly trained employees manage the [finished heat sink] design and testing equipment. Substantial thermal analysis and testing are associated with the front end of [finished heat sink] production.

C.R. 496 at 8. In its determination, the Commission cited testimony from Aavid Vice President Norm Soucy detailing the equipment and expertise required to transform heat sink blanks and fabricated heat sinks into finished heat sinks, C.R. 496 at 8 (citing P.R. 239 at 172-173), and was

presented with diagrams and explicitly labeled photographs of the requisite testing equipment, C.R. 436 Attach. A; C.R. 459 Attach. F.

The record demonstrates that there are indeed differences in the production process between the two products. The ITC reasonably concluded that specialized equipment, procedures, and personnel involved in testing and certifying finished heat sinks distinguish them from other aluminum extrusions, including (non-tested) fabricated heat sinks. Plaintiff fails to support its claim to the contrary. Accordingly, the ITC's determination on this issue is supported by substantial evidence.

### 5. Customer and Producer Perceptions

The Commission also found that, "[a]lthough most U.S. producers and importers of aluminum extrusions generally reported that [finished heat sinks] and other aluminum extrusions are comparable in terms of customer perceptions, there is evidence in the record that customers and producers of [finished heat sinks] perceive them to be distinct from other aluminum extrusions." C.R. 496 at 8. As an example, the ITC cited "a number of customers" as well as Wakefield, which indicated that they "separate[] [their] production of [finished heat sinks] and other aluminum extrusions into different lines of business." C.R. 496 at 8-9.

Plaintiff argues that this finding is not based on substantial evidence given that a majority of producers and importers, including [[                                              ]], stated that the two products are comparable. Pl.'s Br. 16, 22-23. Plaintiff also argues that in making its determination the Commission impermissibly relied on customer perception data from only [[                                                                                    ]]. Pl.'s Br. 24. Though most respondents did indicate that finished heat sinks and aluminum extrusions are perceived as comparable, the Commission cited evidence that several customers [[

]].  C.R. 496 at 9 (citing

C.R. 436 at 18).  The Commission has the right to make credibility determinations and to resolve

conflicts in the evidence, *Chung Ling*, 16 CIT at 648, 805 F. Supp. at 55, and "[s]ubstantial

evidence does not require that the overwhelming weight of the evidence support the

Commission's conclusion." *Torrington Co.*, 14 CIT at 656, 747 F. Supp. at 753 (citations

omitted).

Here, the Commission acknowledged that most customers' and importers' perceptions

did not serve to distinguish the two products.  C.R. 496 at 8-9.  Had the Commission relied more

heavily on this prong, the fact that most producers and importers described the products as alike

might lend more support to Plaintiff's request for a remand.  It did not, however.  Instead, this

factor appears not to have weighed heavily in the ITC's analysis and the agency makes no

conclusion regarding this factor that is not supported by record evidence. The Commission

merely noted that some responses indicated that the two products are perceived as distinct and

there is no valid reason to remand on that basis.

Plaintiff also argues that the determination is unreasonable as it relied on an out-of-date

response from Wakefield.  Pl.'s Br. 23.  Plaintiff avers that, [[


]].  Pl.'s Br. 23.  The record does not support this argument.  It is true

that [[

]]  Plaintiff's argument is thus without merit.

### 6. Price

For the final factor, price, the Commission compared the average unit value ("AUV") of aluminum extrusions with that of finished heat sinks and determined that the AUV of finished heat sinks ([[          ]]) was [[                    ]] higher than the AUV of other aluminum extrusions ([[        ]]).  C.R. 496 at 9.  The Commission further concluded that this price differential "is attributable to the value added in the labor-intensive [finished heat sink] production process." C.R. 496 at 9.  Finally, the Commission noted that finished heat sinks "are priced on a different basis than other aluminum extrusions; [Finished heat sinks] are sold by piece, whereas aluminum extrusions are typically sold on the basis of a metal price plus a per pound fabrication charge." C.R. 496 at 9.

Plaintiff first argues that this finding is unreasonable because the Commission lacked data on the pricing of non-tested heat sinks.  Pl.'s Br. 24.  Plaintiff contends that the Commission could not properly support its differentiation of finished heat sinks because it failed to compare prices for in-scope and out-of-scope heat sinks.  Pl.'s Br. 24.  The Commission bears the duty only of considering all record evidence and issuing a finding reasonably based thereon.  *See* 19

C.F.R. § 207.4(a) ("The Commission need not consider in its determinations or include in the record any material that is not filed with the Secretary."). Plaintiff's argument asks the court to remand the like-product finding based on evidence not in the record. Plaintiff speculates that this evidence would undermine the ITC's determination, but this is not a valid basis for a remand.

    Plaintiff also challenges the determination on the grounds that prices for all aluminum extrusions (including finished heat sinks) vary based on the amount of fabrication. Pl.'s Br. 24-25. Plaintiff relies on [[




                                                                        ]][4] Plaintiff summarizes its argument as follows: "[Finished heat sinks] are no different than other aluminum extrusions because the ultimate prices are determined by the metal cost and extent of fabrication." Pl.'s Br. 25. It seems, however, that the conclusion to be drawn is that finished heat sinks *do* differ from other aluminum extrusions because of their particular production- and finishing-based pricing. The thrust of Plaintiff's challenge (that all manner of aluminum extrusions can be differentiated on this basis) seems directed more at the curious breadth of the "all other aluminum extrusion" like-product category

---

[4] Plaintiff also argues that, in its [[

                        ]] The Commission is, however, presumed to have considered this evidence and the court does not find the views of a single producer sufficiently detracting from the record evidence the Commission did rely upon so as to warrant a remand.

than the validity of distinguishing finished heat sinks on this basis. It is again necessary to note that it is the latter, and not the former, that is before the court for review.

Finally, Plaintiff argues that the Commission's price finding is undermined by the fact that certain other extrusions are similarly priced on a per-piece basis. Pl.'s Br. 25-26. As discussed above, a Commission's like-product determination is not invalidated merely because there is some overlap between different types of products. In this case, the Commission compared the AUV of aluminum extrusions with that of finished heat sinks, and noted that finished heat sinks are sold by the unit while aluminum extrusions are generally sold by the short ton. C.R. 496 at 9. The Commission's determination that pricing of finished heat sinks supports a separate like-product determination is reasonable. Based on the six factors discussed above, the Commission reasonably concluded that producers of finished heat sinks constitute a separate domestic industry for purposes of its material injury analysis and the court may not question this determination.

**B. The Commission's Negative Material Injury Determination**

Section 1677 tasks the Commission with determining whether subject imports are causing material injury to the domestic industry. 19 U.S.C. § 1677(7). To make this determination, the ITC must consider "(I) the volume of imports of the subject merchandise, (II) the effect of the imports of that merchandise on the prices in the United States for domestic like products, and (III) the impact of imports of such merchandise on domestic producers of domestic like products, but only in the context of production operations within the United States . . . ." § 1667(7)(B)(i)(I)-(III). In this case, the Commission concluded that the volume of subject imports had increased during the period of investigation, but not significantly, that the subject imports were not underselling or suppressing prices of domestic like products, and that the trends

in subject imports did not correlate with the performance of the domestic industry. C.R. 496 at 33-36. Plaintiff contests these findings.

### 1. Volume of Imports

"In evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant." § 1677(7)(C)(i). In this case, the Commission relied on import volume data submitted in questionnaire responses by [[                                        ]] and compiled in Table E-2 of the staff report. C.R. 485 at I-15 n.19, E-4. Agency staff received questionnaire responses from other importers as well, but concluded that the volume data contained therein were either "incomplete or contained discrepancies." C.R. 485 at I-15 at n.19. The Commission noted that the quantity of finished heat sink imports decreased from [[    ]] short tons in 2008 to [[   ]] short tons in 2009 and increased to [[      ]] short tons in 2010. C.R. 496 at 33. The market share of subject imports increased from [[     ]] percent in 2008 to [[     ]] percent in 2009 to [[     ]] percent in 2010, while the ratio of imports to domestic production remained at [[      ] percent in 2008 and 2009 and increased to [[    ]] percent in 2010. C.R. 496 at 33. The Commission concluded that subject import volume and corresponding market share, as well as the increase thereof, were not significant. C.R. 496 at 33.

Plaintiff argues that this finding is not supported by substantial evidence. Pl.'s Br. 26. Plaintiff first contends that it was improper for Commission to rely on data from [[          ]] importers' questionnaire responses and that it failed to send importer questionnaires to [[

]]. Pl.'s Br. 26. Defendant and Defendant-Intervenor argue that Plaintiff failed to

exhaust this argument as it did not challenge the importer data in Table E-2 before the

Commission.  Def.'s Br. 25; Def.-Intervenor's Br. at 26-27.  In response, Plaintiff refers to its

posthearing administrative brief, in which it argued that

> [t]he total size of the heat sink market is much larger than what Aavid would lead the
> Commission to believe.  The Appendix E heat sink aggregate data are an unreliable
> gauge of the performance of a putative [finished heat sink] industry because they do not
> reflect the [finished heat sink] industry or market in the United States. . . . [T]he market is
> far larger than the data presented in [T]able E-1. . . . [[
>
>
>                                                                                                        ]].

C.R. 457, Answers at 26-27.  Exhausting administrative remedies requires parties to make

specific arguments before the appropriate agency prior to raising those arguments before the

Court.  *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).  Merely

discussing a general issue will not serve this purpose.  *Id.*  Though Plaintiff contested Appendix

E in its posthearing brief, its argument is directed at the Commission's data on domestic

consumption of finished heat sinks, not volume of imports.  Plaintiff has not identified any

instance in which it specifically challenged the data on record in Table E-2.  Because Plaintiff

did not raise this argument below, the court finds that this argument is precluded.[5]

---

[5] It is unlikely this argument would have rendered the Commission's finding unsupported by
substantial evidence.  The Commission has no obligation to collect a perfect data set. *See United
States Steel Grp.—A Unit of USX Corp. v. United States*, 18 CIT 1190, 1203, 873 F. Supp. 673,
688 (1994) (holding that the ITC "is not required to gather 100% coverage in the questionnaire
responses before it can make a determination").  "The applicable standard is 'not whether the
Commission might have obtained additional information, but whether the determination is
supported by substantial evidence on the record and according to law.'" *Id.* (citation omitted).  In
this case, the Commission sent questionnaires to the firms that Plaintiff identified in its petition
and to firms that had imported more than one percent of total imports under the relevant
subheadings of the Harmonized Tariff Schedule of the United States since 2008, ultimately
obtaining data representing 93.3% of total subject imports using the questionnaires, and found
that [[            ]] questionnaire responses were usable. C.R. 485 at I-15 n.19, IV-1 n.2.  This is a
plainly reasonable exercise of the Commission's statutory duty.

Plaintiff also argues that the Commission's determination is undermined by [[

]], which demonstrates that the Commission underestimated the increase in

subject import volume.  Pl.'s Br. 27.  Finally, Plaintiff argues that purchaser questionnaire

responses indicate that purchases of imported finished heat sinks [[

]], and that [[

]].  Pl.'s Br.

28, Ex. 1.  Plaintiff argues that the determination cannot be supported by substantial evidence as

the Commission failed to address these contradictory data.  Pl.'s Br. 27.

Again, Defendant-Intervenor argues that Plaintiff failed to raise these arguments before

the Commission and may not do so now.  Def.-Intervenor's Br. 26-27.  In this instance, however,

the record does not support this argument.  In its posthearing administrative brief, Plaintiff stated

that

[[

]]

C.R. 457 at 12.  Plaintiff also provided data showing that domestic finished heat sink purchasers

had noticeably shifted their purchases from domestic to imported finished heat sinks during the

period of investigation.  C.R. 457 at 12-13.  "While a plaintiff cannot circumvent the

requirements of the doctrine of exhaustion by merely mentioning a broad issue without raising a

particular argument, plaintiff's brief statement of the argument is sufficient if it alerts the agency

to the argument with reasonable clarity and avails the agency with an opportunity to address it."

*Luoyang Bearing Corp. v. United States*, 28 CIT 733, 761, 347 F. Supp. 2d 1326, 1352 (2004).

Plaintiff's challenge leaves much to be desired in terms of the specificity with which it is framed.

The court finds, however, that noting [[

]] and the rise in purchases of imported finished heat sinks was sufficient to alert the

Commission to this argument.

Whether the Commission was required to address these data, however, is another matter.

Defendant and Defendant-Intervenor each respond that the Commission does not generally use

export data to measure import volume because these data do not account for merchandise entered

for reasons other than consumption (i.e., transshipments) and may reflect imports that shipped

during the year in review but arrived the following year. Def.'s Br. 26; Def.-Intervenor's Br. 28.

Regarding the purchaser questionnaire data, Defendant-Intervenor notes that [[

]]

"The ITC enjoys broad discretion to choose a methodology for measuring volume." *Int'l*

*Imaging Materials, Inc. v. U.S. Int'l Trade Comm'n*, 30 CIT 1181, 1189 (2006) (citation omitted)

(not reported in F. Supp.); *see Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1359 (Fed.

Cir. 2006) ("So long as there is adequate basis in support of the Commission's choice of

evidentiary weight, the [Court], and [the Federal Circuit], reviewing under the substantial

evidence standard, must defer to the Commission."). "The use of importer questionnaire data to

calculate subject import volumes is a well-established and accepted practice." *Celanese Chems., Ltd. v. United States*, 31 CIT 279, 288 (2007) (not reported in F. Supp.). Moreover, the Commission is presumed to have considered all evidence on the record, *Nucor Corp. v. United States*, 28 CIT 188, 234, 318 F. Supp. 2d 1207, 1247 (2004), though it "must address significant arguments and evidence which seriously undermine[] its reasoning and conclusions," *Altx, Inc. v. United States*, 25 CIT 1100, 1117-18, 167 F. Supp. 2d 1353, 1374 (2001).

The Commission is presumed to have considered the effect of the [[

]] and purchaser questionnaire responses, and Plaintiff has proffered nothing to rebut this presumption. In addition, the Commission was within its discretion to rely on actual import data to measure volume. [[                            ]] export data does not seriously undermine the data compiled in Table E-2 because, as Defendant succinctly notes, "the two data sets measure different things." Def.'s Br. 26. Similarly, the court cannot conclude that the purchaser questionnaire data seriously undermined the Commission's conclusion. Indeed, the discrepancy in the volume data may be explained by the ITC's exclusion of import data from [[    ]] companies because their questionnaires were incomplete and contained discrepancies. C.R. 485 at I-15 n.19. Moreover, remanding on this basis would require the court to determine that [[



]]. Plaintiff has given no reasoned basis upon which the court could make such an interpretive leap. Because the Commission reasonably interpreted the import data before it, the court will not disturb this finding.

**2. Price Effect**

"In evaluating the effect of imports of [subject] merchandise on prices, the Commission shall consider whether -- (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree." § 1677(7)(C)(ii).  In the final determination, the Commission relied on comparative pricing data from [[      ]] Product 7.  C.R. 485 at V-6; C.R. 496 at 35.  Product 7 yielded only one quarter of overlapping data between domestic and import prices, during which time subject imports oversold the domestic like product by [[    ]] percent.  C.R. 496 at 35; C.R. 485 at V-14.  The data also reveals, however, that domestic prices decreased dramatically in the third (overlapping) quarter of 2009, after which time the only pricing data available is for [[       ]] imported, rather than domestic, finished heat sinks.  C.R. 485 at V-14.  The agency recognized the limited nature of the data and acknowledged that all the data were associated with the imports and domestic sales of just one company.  C.R. 496 at 35.  It noted, however, that the domestic industry's cost of goods sold ("COGS") decreased from [[    ]] percent in 2008 to [[    ]] percent in 2010, further "suggesting that prices were not being significantly suppressed in relation to costs."  C.R. 496 at 35.  The Commission concluded that these data did not suggest significant price underselling or suppression.  C.R. 496 at 35.

Plaintiff argues that the Commission misread the quarterly sales price analysis regarding Product 7.[6]  Pl.'s Br. 29.  Specifically, Plaintiff points to the dramatic reduction in domestic price

[6] Defendant argues that Plaintiff is estopped under the doctrine of exhaustion from challenging the Commission's reliance on Product 7 data.  Def.'s Br. 29.  Defendant argues that Plaintiff failed to proffer any alternative pricing data and merely expressed a vague concern with the

in the third quarter of 2009 (as well as the minor price reductions in previous quarters) and

suggests that the shift in Product 7 pricing data to imported finished heat sinks establish that

[[                                                                                        ]]  Pl.'s Br. 29.

Plaintiff thus believes that the Commission's interpretation of the Product 7 was unfounded.

Pl.'s Br. 30.

"[E]ven if it is possible to draw two inconsistent conclusions from evidence in the record,

such a possibility does not prevent [the Commission's] determination from being supported by

substantial evidence." *Nippon Steel Corp.*, 458 F.3d at 1352 (quoting *Am. Silicon Techs. v.

United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001)).  The shift in pricing data from domestic to

imported finished heat sinks is, as Plaintiff suggests, noticeable.  So too is the drastic drop in

domestic price in the only quarter with comparable pricing data and the subsequent low price of

imported heat sinks thereafter.  C.R. 485 at V-14.  The court's duty is not, however, to adjudicate

the merits of Plaintiff's interpretation of the pricing data but rather to ask whether the

Commission's determination on the basis of that data is adequately supported.  It is.  The

Commission found that in the sole quarter of comparable pricing data, subject imports oversold

their domestic counterparts.  The Commission recognized the limitations in its data, but

buttressed its conclusion with reliance on the ratio of COGS to net domestic sales, which, as

noted, demonstrates that prices were not being suppressed in relation to costs.  Although there

---

narrow scope of Product 7 data in a footnote in its prehearing brief.  C.R. 435 at 41 n.165
("Based on the data, it seems clear that this product [[
                                        ]]").  The court reads Plaintiff's brief somewhat differently,
however.  Before this court, Plaintiff appears only to challenge the Commission's *analysis* of the
pricing data and not its reliance on Product 7 per se.  Pl.'s Br. 29.  Defendant does not contend
(nor could it) that Plaintiff failed to exhaust its current challenge to the Commission's analysis of
the pricing data.  C.R. 435 at 41.

are limited data points on this issue (which is unfortunate), the Commission's determination is affirmed, given the evidence presented in the record.[7]

Plaintiff also argues that the Commission failed to consider [[                              ]] that demonstrate underselling and loss of domestic sales as a result of imports.  Pl.'s Br. 30. Specifically, Plaintiff argues that [[



]].  Pl.'s Br. 30-32.  Additionally, Plaintiff points to evidence that

[[

]].  Pl.'s Br. 32-33.  This argument is not persuasive.  As with its volume of import investigation, "the ITC has broad discretion in selecting the appropriate analysis or methodology to apply to its review of subject import price effects."  *Hynix Semiconductor, Inc. v. United States*, 30 CIT 1208, 1215, 431 F. Supp. 2d 1302, 1310-11 (2006).  Though Plaintiff relies on a different body of evidence to conclude there were price effects, Plaintiff fails to show that the Commission's interpretation of its chosen data set (Product 7 pricing data) was unreasonable.  It is not within the court's discretion to question the agency's chosen methodology, if it is reasonable, as it is here, nor draw its own conclusions from the evidence.

### 3. Impact of Imports

Section 1677 directs that, "[i]n examining the impact [of subject imports on domestic producers], the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry in the United States . . . ."  § 1677(7)(C)(iii).  Relying on domestic

---

[7] Plaintiff also avers that the Commission improperly did not use Product 7 import data reported by [[                    ]].  Pl.'s Br. 30.  The record shows, however, that [[
                                                                                        ]]  As such, this merchandise was not within the scope of the investigation, C.R. 496 at 4, and the Commission was under no obligation to include the data in its analysis.

producer data in Table E-1, the Commission determined that the domestic industry's capacity remained the same throughout the period of investigation. C.R. 496 at 36. It also found, *inter alia*, that the industry's production, capacity utilization, domestic shipments, net sales, net sales value, and operating income all declined between 2008 and 2009 before recovering somewhat in 2010. C.R. 496 at 36-37. The industry's average number of workers declined from [[     ]] in 2008 to [[     ]] in 2009 to [[     ]] in 2010, and wages decreased from [[          ]] in 2008 to [[          ]] in 2009 and 2010. C.R. 496 at 37. The Commission concluded that, "[a]lthough the indicators of the domestic industry's condition declined from 2008 to 2009 and, in many cases, remained lower in 2010 than they had been in 2008, there was no correlation between trends in the subject imports and the industry's condition. For example, subject import volume and market share were highest in 2010, when many of the domestic industry's indicators showed improvement." C.R. 496 at 37.

Plaintiff argues that the ITC's domestic industry data in Table E-1 is flawed because of the purportedly inconsistent definitions of finished heat sink given throughout the investigation.[8] Pl.'s Br. 33. Plaintiff contends that the Commission meaningfully altered the definition of finished heat sinks by amending the "fully test (sic) and assured" component provided in the questionnaires to "fully, albeit not necessarily individually, tested" in the final scope definition. Pl.'s Br. 33-34. Plaintiff contends that, because of this revised definition, "[i]t is possible that

---

[8] Defendant avers that Plaintiff waived its challenge to the Commission's finished heat sink aggregate data because Plaintiff admitted that Table E-1 of the Commission's Staff Report "reflects the . . . testing parameters imposed by Aavid's like-product definition." Def.'s Br. 38. Although Plaintiff admitted that Table E reflected the testing parameters, it referred to those same testing parameters as "arbitrary and unfounded," C.R. 492 at 12, signaling clear disagreement with the scope of the ITC's definition of finished heat sinks. Plaintiff's challenge to the definition of finished heat sinks forms the foundation for its challenge to the Commission's aggregation. Moreover, as discussed, Plaintiff challenged the Table E-1 in its post-hearing brief. C.R. 457, Answers at 26.

some domestic producers that were excluded from the industry based on application of the strict

'fully tested and assured' requirement [in the ITC's questionnaire definition] should have been

included within the industry because they perform sample post-production testing," thereby

satisfying the definition in the final determination. Pl.'s Br. 34. Plaintiff also suggests that some

Aavid heat sinks were improperly included in the production data as it admitted that it does not

perfect testing on each heat sink it produces. Pl.'s Br. 35. A plain reading of the two definitions

provided for finished heat sinks reveals that the Commission never required that each finished

heat sink be *individually* thermally tested. In its final determination, the Commission correctly

noted that the definition it adopted "clarifies the definition used in the questionnaire," and that

"the dataset [the ITC] collected for [its] determinations is consistent with [the questionnaire

definition]." C.R. 496 at 32 n.165. Plaintiff's argument is therefore without merit.[9]

Plaintiff also argues that domestic production data from [[          ]] was improperly

included based on a confusion regarding this shifting definition of in-scope heat sinks. Pl.'s Br.

34. Plaintiff avers that [[

                                                                      ]] Plaintiff is mistaken.

In its email, reproduced in part above, [[          ]] committed the same error that Plaintiff does

by interpreting the questionnaire definition of finished heat sink as requiring that every heat sink

be individual tested. As noted, this was not the case. Indeed, [[

                                                                      ]] C.R. 478. Though

_____

[9] Plaintiff further argues that the data aggregations are unreliable because the Commission
[[                                                                ]]. Pl.'s Br. 34. Plaintiff is mistaken.
Although [[                                                       ]], the Commission intentionally
excluded its responses from the data aggregation because [[                    ]] did not indicate
that it thermally tests their heat sinks, C.R. 394, and hence they were not within the scope of the
investigation.

[[            ]] itself appears somewhat confused by the Commission's original definition, inclusion of its production data was not erroneous.

Plaintiff next argues that other record evidence renders the Commission's finding unsupported.  Specifically, Plaintiff notes that [[

]].

Pl.'s Br. 36.  Additionally, Plaintiff argues that evidence suggests that [[

]]. Pl.'s Br. 37.  The ITC has the "discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis." *Goss Graphics Sys., Inc. v. United States*, 22 CIT 983, 1004, 33 F. Supp. 2d 1082, 1101 (1998) (citation omitted).  Plaintiff has proffered nothing to suggest that the Commission did not consider this (lightly) detracting evidence, and the court does not consider these data sufficiently significant as to warrant a remand for explanation.  It was reasonable, based on the data in Table E-1, for the Commission to conclude that the domestic industry was not injured by reason of subject imports.[10]

**C. The Commission's Negative Threat of Material Injury Determination**

Finally, Plaintiff argues that the Commission's negative threat of material injury determination failed to account for evidence tending to show that subject imports may threaten the domestic industry in the future.  Pl.'s Br. 38-40.  Defendant-Intervenor argues that Plaintiff failed to exhaust its administrative remedies by not arguing before the Commission that the

_____

[10] Plaintiff also argues that the Commission's finding regarding the impact of subject imports was flawed as it underestimated the true volume of imports. Pl.'s Br. 33. As the court discusses above, however, the Commission's finding regarding volume was supported by substantial evidence.

record supports an affirmative threat of material injury determination. Def.-Intervenor's Br. 38.

"[T]his Court has 'generally take[n] a strict view of the need [for parties] to exhaust [their] remedies by raising all arguments' in a timely fashion so that they may be appropriately addressed by the agency." *Consolidated Fibers, Inc. v. United States*, 32 CIT 855, 574 F. Supp. 2d 1371, 1379 (2008) (alternations in original) (citation omitted). In this case, Plaintiff has not identified any instance in which it specifically argued the issue of material threat to the domestic finished heat sink industry before the Commission. Pl.'s Reply 14-15; Pl.'s Citations to the R. 7-8. At best, Plaintiff is able to refer to a passage in its posthearing brief concerning the plans of

[[

]] Exports of finished heat sinks from China

[[

]] In sum, the record establishes a dramatic shift of [finished heat sink] purchases to China from U.S. producers due solely to underselling. C.R. 457 at 13 (footnotes omitted). Noting the effect of imports on a single producer in the context of existing injury due to underselling is not sufficient to alert the agency with reasonable clarity that Plaintiff is questioning its threat of material injury finding. This challenge is therefore precluded.

## IV. CONCLUSION

For the foregoing reasons, the Commission's determination is affirmed. The court will enter judgment accordingly.


Dated: __October 11, 2012__                    _____/s/ Judith M. Barzilay_____
          New York, NY                          Judith M. Barzilay, Senior Judge